HAMITER, Justice.
 

 Irvin Mattio is appealing from his conviction and sentence for the murder of Sylvian Paul Cassagne on May 3, 1945.
 

 The indicting of him by the Orleans Parish Grand Jury occurred May 10, 1945. When arraigned four days later he pleaded not guilty.
 

 On July 23, 1945, appellant, through his attorney, obtained an order of court requiring the Superintendent of the New Orleans Police Department and the District Attorney of Orleans Parish to show cause why his attorney should not be permitted to see, read, and, if thought advisable, make a copy of the police report, then in the possession of the superintendent and the district attorney, which was prepared by the police officers who investigated the commission of the alleged offense. At a hearing of the rule to show cause, issued pursuant to the order, the court refused to grant to appellant the privilege sought, and to the ruling a bill of exceptions was reserved.
 

 On July 25, 1945, the trial was proceeded with, and on the following day the jury returned a verdict of guilty as charged. During the course of the trial appellant reserved thirteen bills of exceptions.
 

 When brought before the court for sentence on September 4, 1945, appellant, through his counsel, filed a motion for a new trial. This motion was denied, to which ruling the final bill of exceptions was reserved, and appellant was sentenced to death by electrocution. This appeal followed.
 

 To properly discuss many of the fifteen bills of exceptions contained in the record it is necessary first to briefly set forth the factual background of the alleged offense committed. The fatal cutting or stabbing of decedent, Sylvian Paul Cassagne, occurred on the sidewalk immediately in front of the Dixie Theatre in New Orleans, a motion picture establishment owned and operated by one Paul Brunet and located in a building bearing Municipal No. 1309 South Rampart Street.
 

 On the ground floor of the building, behind the ticket office, are a small lobby, the private office of the owner, and a stairway leading to the second floor where the picture show is conducted. On reaching the second floor, after ascending the stairs, a patron faces the screen (situated in the building’s rear) and also the backs of the numerous theatre chairs. Among the regular emyloyees of the establishment at the time were Albert Nuss, the floor manager, and Henry West, the janitor and the attendant at the cold drink stand. While
 
 *147
 
 not an employee, the decedent was a close personal friend of Brunet and often visited him at night, assisting in the collecting of tickets.
 

 As appellant sat in the third or fourth row of the theatre, about nine o’clock of the night of May 3, 1945, one Earl Silket entered the show and walked down the aisle toward the screen. Momentarily thereafter a struggle between those two ensued, and the other patrons, becoming panicky because of the commotion created, commenced to leave hurriedly. Nuss, the floor manager, observed the difficulty and intervened; whereupon, appellant rushed toward the stairway at the front of the building. Just before reaching the top of the stairs, however, he was stopped and held by Henry West, the janitor and cold drink attendant, to whom instructions of “catch that man” had been yelled by Nuss. Appellant was then delivered by West to Brunet, the owner and operator who had come to the second floor to make an investigation of the disturbance, and they began descending the stairs. When part of the way down appellant began to struggle, in an effort to free himself from Brunet’s hold, causing both to tumble the remaining distance to the lobby and resulting in a hip injury to Brunet. Decedent, who was standing near by, came to the assistance of Brunet, and they, along with Nuss, sought to detain appellant who continued his desperate struggle.
 

 About this time Brunet went into his private office, some ten feet away, and returned with a wooden instrument commonly known as a billy. With it, a moment or so later, he struck appellant on the forehead once. The latter on being struck fell to his knees near the entrance door, then recovered and went out onto the sidewalk. Also going outside was the decedent; while Brunet partially ascen4ed the stairs to observe the situation in the picture show.
 

 As decedent stood on the sidewalk, in front of the establishment, appellant cut or stabbed him three times, with what he called a Texas knife, and then left the scene. After receiving the injuries, which affected his heart and lungs, the small intestine, and ulnar artery of the left wrist, decedent returned to the lobby and spoke to Brunet, saying: “Paul, he cut me.” He was rushed to the hospital, but shortly after reaching there death resulted.
 

 On his being arrested two days later, appellant admitted the cutting of decedent; also, he conducted the arresting officers to a sewer drain or manhole, located at the corner of Liberty and Clio Streets, where they recovered the knife which he had used and later deposited there. Then he was taken to the office of the district attorney and there questioned by Superintendent of Police George Reyer, in the presence of the district attorney, several police officers, and other officials. After answering -a few questions propounded to him, he proceeded to talk at length, giving in detail his
 
 *148
 
 version of the commission of the alleged offense. What he had to say, together with the questions propounded, was taken down in writing and transcribed by the district attorney’s stenographer.
 

 In the statement, which was signed by him, he said that as he sat in the Dixie Theatre, Earl Silket (referred to as Tweed) grabbed him and attempted to stab him with a knife. In the scuffle that followed he slipped to the floor with Silket on top. When the floor manager separated them he ran toward the stairway. The statement in part, further reads: “ * * * I tussled with Mr. Cassagne, Mr. Brunet and the colored porter who works there down the steps. While the scuffle was going on the stairs inside the door that leads to the street, my pistol fell from my pocket. Mr. Cassagne said to Mr. Paul Brunet, ‘Go get the black jack.’ Mr. Paul Brunet came back with the black jack. At that time when Mr. Paul came back I was still scuffling with Mr. Cassagne and the porter and somebody else that I do not know trying to get away from them. When Mr. Paul came he grabbed me again, and I was scuffling with them and told them to turn me loose and while I was scuffling with them, Mr. Paul had the black jack and just as I was about to break loose he hit me over the forehead with the black jack and it stunned me and I started to fall and they picked me up. I snatched a loose and I stumbled through the door to the sidewalk, I felt my head and felt the blood. Mr. Cassagne while I was on the sidewalk came towards-me as if to grab me. I said to him ‘Man let me alone, I aint done nothing.’ At the time I backed off from him, I had my knife in my hand having taken it out of my pocket when I stumbled through the-door and after I backed off from Mr. Cassagne I jumped right back into him and jugged him with the knife and as well as-I can remember I jugged him in the chest which side I do not remember. I just remember jugging him once but I may have-jugged him more than once. After I jugged him once I started walking down Rampart Street towards Erato Street and after five (5) feet I noticed a colored man following me and this colored man hollowed, ‘Catch him he done cut Mr. Cassagne’. Then I broke into a run and when I got to Erato and Rampart Streets I ran back Erato Street to Saratoga Street but before I reached Saratoga Street I noticed this same colored fellow who started behind me on Rampart Street still behind me, and I then turned down Saratoga Street to Clio Street and ran back Clio-Street to Liberty Street and went to my house at 1239 South Liberty Street, and I went in the toilet and took my shirt off,, which is blue-gray, the one that I now see in your (Supt. Reyer’s) hands. The reason why I took this shirt off is because it had blood on it that came from my head where I had been hit with the black jack. After I took it off I dropped it on the floor in the toilet and left it lying there. I then went in my house and got this green
 
 *149
 
 sweater and this blue jumper that-I am now wearing and I took eight (8) or nine (9) bandages out of the chifforobe and then left the house. I went down Liberty Street to Calliope Street, and as I reached Clio Street I took the knife that I had jugged Mr. Cassagne out of my pocket and threw it in the drain. * *. * ”
 

 It is noticed that in his statement, a great portion of which is quoted above, appellant admits his act of cutting the deceased; but he relates facts and circumstances in justification of it. And during the trial his defense was similarly predicated, although then he denied that he had a pistol while in the theatre. His contention was that Brunet struck him on the head with the billy without cause or provocation whatever, he having done nothing except attempt to leave the theatre and avoid trouble with Silket, and that after having been struck he was justified in cutting the deceased, who was advancing on him, to prevent further injury to his person.
 

 The theory of the prosecution, on the other hand, was that when Silket entered the show and was about to sit down appellant pulled a pistol on him. Because this incident resulted in a stampede and near riot by the patrons, Nuss, Brunet and the deceased attempted to arrest appellant. While being held in the lobby on the ground floor, after his tumbling down the stairway with Brunet, appellant was desperately trying to release himself from lawful arrest, and in his effort to do so became resentful and belligerent. Brunet and the decedent had previously been commissioned by the Superintendent of Police to make arrests; also, both were authorized to carry weapons, although they were unarmed at the time. The State further contended that Brunet, believing from appellant’s actions that he had a bad boy to contend with, secured from his office the billy and then said to appellant: “Take it easy, nobody is going to hurt you, but I am going to hold you until I find out what trouble you caused up stairs.” Notwithstanding this assurance, appellant continued to struggle; and upon succeeding in releasing himself reached for his pocket. Brunet, thinking that a weapon from„ the pocket was being sought, struck appellant one blow on the forehead with the billy. After appellant and decedent had gone outside, and while they stood about ten feet apart on the sidewalk, the former, under the State’s theory, ran to the latter, who was then molesting no one, and cut him three times.
 

 To consider now the several bills of exceptions contained in the record, the first one reserved relates to the court’s denial of the motion of appellant’s attorney to see, read, and copy the police report which was then in the hands of the district attorney and the superintendent of the police department. Mover, on his application, was furnished a copy of the statement given by appellant to the Superintendent of Police in
 
 *150
 
 the district attorney’s office; but he insists that he was entitled to have also a copy of the police report which disclosed the result of the entire investigation conducted by the police officers. The claim to this right is based on the provisions of Act 195 of 1940 (the Public Records Act), counsel contending that police reports are public records within the contemplation of such statute and that they are not excepted under the provisions of Section 3 thereof which reads in part as follows: “That the provisions of this Act shall not apply to public records, as defined herein, when the same are held by any sheriff, district attorney, police officer, investigator or investigating agency of the State as evidence in the investigation for or prosecution of a criminal charge, until after such public records have been used in open court or the criminal charge has been finally disposed of; :|t $ h=
 
 ”
 

 In this connection the argument is made by counsel that “a police report is not evidence, nor can it be used as evidence under any ci?cumstances, and can not be used in open court for any purpose, except perhaps for the person who made it refreshing his memory.”
 

 We entertain considerable doubt that a police report is a public record as ■distinguished from a private record. But if it is a public record clearly it would •come within the quoted exception of the statute’s Section 3, for it evidences the findings of the police officers in their investigation of a particular criminal charge.
 

 Very similar to Act 195 of 1940, and covering the same subject matter, was Act 242 of 1912, as amended by Act 255 of 1920. It provided also for the inspection of all public records except as recited in Section 5 thereof as follows: “The provisions of this act shall not apply to public records, as defined herein, when the same are held by any sheriff, district attorney or police officer as evidence for the prosecution of a criminal charge, until after such public records have been used in open court or the criminal charge has been finally disposed of; * *
 

 It is noticed that this section excepted public records “when the same are held * * * as evidence in the investigation for or prosecution of a criminal charge.” Yet in State v. Dallao, 187 La. 392, 175 So. 4, 20, this court decreed that under the former or superceded'statute a defendant was not entitled to oyer and inspection of police reports until used in open court. There we said: “The defendant Cauche complains of the ruling of the trial judge refusing him oyer and inspection of statements, reports, confessions, and documents alleged to be in the possession of the police department. We find no error in the ruling. So far as the documents called for were public in character, defendant was not entitled to their inspection until they had been used in open court. Section 5 of Act No.242 of 1912, as amended by Act No.
 
 *151
 
 255 of 1920, § 3. And so far as they were of a private nature, defendant was not entitled to their inspection until they were offered in evidence. State v. Lee, 173 La. 966, 139 So. 302.”
 

 In the mentioned case of State v. Lee, we had previously observed:
 

 Appellants’ additional demand for oyer of all police reports and written statements of witnesses in possession of the state was properly denied by the trial judge.
 

 “The reports and statements called for were not public documents, but were the private property of the state.”
 

 The Lee and Dallao cases were in contemplation when we commented in State v. Dorsey, 207 La. 928, 22 So.2d 273, 285, that: “It is not our intention to overrule the prior jurisprudence of this State, and particularly the various cases cited by counsel for the State, in each of which defendant was denied pre-trial inspection of written confessions of codefendants, written statements of witnesses, or police reports in the hands of a sheriff, police department, or district attorney, and we do not overrule these cases.”
 

 There appears no good reason for now overruling those decisions; accordingly, the ruling of the district judge regarding the police report is sustained.
 

 Neither do we find any merit to bill of exceptions No. 2. It was reserved when the court permitted the State to identify and to introduce in, evidence certain photographs showing the injuries that Brunet received on his hip while tumbling down the stairway during his struggle with the accused, defense counsel having objected thereto on the ground that the photographs were irrelevant and were offered solely for the purpose of creating prejudice in the minds of the jury. Assuming, but not deciding, that the photographs were irrelevant, their introduction was in
 
 no
 
 manner prejudicial to appellant. Without any objection from defense counsel whatever, Brunet testified at length to his struggling with appellant and the injuring of his hip; hence, the jury received from that witness the identical information that the pictures furnished.
 

 While Brunet was on the witness, stand he told of his desperate struggle with Mattio in the theatre’s lobby, as. well as of prior events connected with the difficulty. Continuing, he testified: “ * * * He still struggled and he broke away from-Mr. Cassagne and Mr. Nuss, and he came for me, reaching for his pocket, and that’s when I struck him one blow on the forehead; he fell to the sidewalk face up. He was up immediately and he backed towards the gutter’s edge. With that, I turned around and went up stairs to this, first landing platform. I noticed the picture was back on the screen and I went down in a matter of seconds, and as I .came right to the foot of that stairway I noticed Mr. Cassagne stepping from the
 
 *152
 
 sidewalk into the lobby holding his stomach. Then I noticed the blood, and he said to me: ‘Paul, he cut me.’ ”
 

 At this point defense counsel objected to the remark attributed to the decedent on the ground that it was made out of the presence of the accused. The court overruled the objection, holding that the exclamation or remark constituted a part of the res gestae, and counsel reserved bill of exceptions No. 3. The ruling, in our opinion, was correct. The remark was uttered immediately after the occurrence of the cutting and it was a part of the continuing action of. the entire affair". Moreover, since appellant admitted the cutting of decedent it could not serve to prejudice him before the jury.
 

 Bills of exceptions Nos. 4 and 5 are to be considered together. They were taken separately, on the overruling of objections, when the same question was propounded to two different witnesses. Two patrons of the theatre at the time of the disturbance, who were produced as witnesses by the State, were questioned about their having found a pistol on the stairway while they were leaving the show. Defense counsel objected to the evidence for the reason that the gun was never identified or produced in court (according to those witnesses they threw it from the dressing room window), and no showing had been made that it belonged to defendant. In support of his rulings on the objections the trial judge, to quote his per curiam, commented:
 

 “During the trial of the case in its early stage, the State contended and proved, without any objection whatever from the defense, that the defendant, while in the show, pulled a gun on one Earl Silket, and that the killing of the deceased resulted from an honest effort on the part of Paul Brunet and the deceased to arrest’ the defendant for the drawing of a gun on a patron in the show.
 

 “The State contended throughout the case that the defendant had a gun. The defense contended he did not. For the purpose of showing the defendant did have a gun, the State offered evidence to show that a gun was actually found within a few feet from where the defendant was sought to be arrested. For that purpose the evidence, in the humble judgment of this court, was relevant, material and admissible.”
 

 Whether or not appellant had a pistol while in the theatre was a definite and important issue in the case, and evidence to show that one was found on the stairway during the occurrence of the disturbance was relevant and admissible. The effect and weight to be given that evidence was for the jury’s determination.
 

 Bill of exceptions No. 6. was taken during the cross-examination of George Reyer, the Superintendent of Police and a witness for the State. For the purpose of contradicting the testimony of Silket (who had previously testified as a State witness), defense counsel propounded some questions to the superintendent concerning a statement allegedly
 
 *153
 
 made to him by Silket during the course of the police investigation. Being unable to obtain the desired contradiction, through his questioning, counsel again asked that the police report be produced. The court refused to order the production, on the State’s objection, and a bill was reserved. It provides the same legal proposition considered and discussed under bill of exceptions No. 1, and for the reasons heretofore assigned the ruling was correct.
 

 While on the witness stand Superintendent Reyer was further cross-examined about the written statement given to him by the accused in the district attorney’s office (above referred to and quoted from extensively.) He admitted that he had propounded questions to the accused-and received answers thereto. Then defense counsel queried “I will ask you if these are not the questions you asked him and are these not the answers you received?” Whereupon the district attorney objected on the ground that the declaration or statement of the accused is self-serving and inadmissible in his behalf. The court sustained the objection and bill of exceptions No. 7 was taken.
 

 As we have previously observed herein the statement given by the accused in the district attorney’s office, although admitting tire fatal cutting of decedent, tends to justify and vindicate his act. It is not, therefore, a true confession; it is in the nature of an exculpatory statement. That there is a clear distinction between the two is well recognized. Thus, in Wharton’s Criminal Evidence, 11th Edition, Volume 2, page 581, we find:
 

 “A
 
 confession may also be distinguished from acts and conduct of the accused which may tend to establish his guilt, and from-statements which, if true, would establish or tend to establish the innocence of the accused.
 

 * * * * * *
 

 “It is also held that to give a statement, the binding force of a confession, its distinctive feature must be an acknowledgement of guilt without any exculpating statement or explanation, * *
 

 This court in the early case of State v. Picton, 51 La.Ann. 624, 25 So. 375, 377, stated: “* * * We look in vain in the-narrative of what took place for a confession or admission of his guilt by defendant. On the contrary, he steadfastly asserted he was innocent of the charge. A statement or declaration, to amount to a confession,, must be inculpatory, and not exculpatory, in its nature. 6 Am. & Eng.Enc.Law, 2d Ed.,, 521, 522. A confession is limited in its precise scope and meaning to the criminal act itself. It does not apply to acknowledgments, of facts merely tending to establish guilt, sintíe a damaging fact may be admitted without any intention to confess guilt. These-are criminating admissions, rather than confessions. Id. There is a broad distinction between the mere admission of inculpatoryfacts and a confession of guilt. Where a person only admits certain facts, from.
 
 *154
 
 which the jury may or may not infer guilt, there is no confession. * * *”
 

 In State v. Aspara, 113 La. 940,
 
 37
 
 So. 883, 889, we said: “It is well settled that a confession, if free and voluntary, is admissible in evidence, even though made by one who at the time of making it was under arrest. * * * But the matter objected to was not a confession; it was an exculpatory statement * *
 

 Further, with reference to the distinction, the following comment is offered in State v. Terrell, 175 La. 758, 144 So. 488, 497: “* * * The statement, within the intendment of the Code of Criminal Procedure, is not a confession, because it does not involve criminal intent or an admission of guilt, but is an acknowledgement of facts, though largely of an exculpatory nature, which has a tendency to establish guilt.
 

 While appellant’s statement in the instant case contained certain admissions of inculpatory facts it was basically exculpatory. It disclosed no criminal intent and recited no admission of guilt; it amounted to nothing more than a self-serving declaration, inadmissible in evidence when offered in the accused’s behalf, as the trial court correctly ruled. Undoubtedly the principal reason for denying a defendant the right to introduce in evidence his exculpatory declaration is that if he were permitted to do so he would be presenting his testimony to the jury without taking the witness stand and without running the risk of impeachment on cross-examination.
 

 A declaration of similar import was involved in State v. Sharbino, 194 La. 709, 194 So. 756, 760, and there held to be inadmissible, the court saying:
 

 “Bill of Exception No. 8 was reserved to the ruling of the trial judge in sustaining the objection of the district attorney to the following question asked the sheriff by the. counsel for the defendant: ’On the occasion that you said Edith made a statement to you and Mr. Fuller in the jail, didn’t she say she had purchased the strychnine and gave it to Frank Sharbino the deceased, telling him at the time to place it where the children could not get it and that subsequently Frank Sharbino took some of it in a cup of coffee.’
 

 “The reason for the state’s objection to and the trial judge’s ruling on the question was that the statement had been made on an occasion other than the occasion being testified to by the witness who was questioned, and, further, that inasmuch as it was made after Edith Moreau Phipps was arrested and incarcerated, it was self-serving. We find no error in the ruling of the trial judge.”
 

 The next four bills of exceptions (9, 10, 11 and 12) were reserved during the cross-examination of the accused by the district attorney. In his statement made in the district attorney’s office appellant had admitted that his pistol fell from his pocket
 
 *155
 
 when he was struggling on the stairway. But while on the stand, he having taken it voluntarily as a witness in his own behalf, he was questioned by the district attorney and testified as follows:
 

 "Q. On the night of May 3rd, the night you killed Sylvan Cassagne, did you have a gun that night? A. No, sir.
 

 “Q. You mean to sit on that witness stand and state you didn’t have a gun that night? A. No, sir; I didn’t.
 

 “Q. I expect to impeach your testimony by a statement you made and will ask you whether or not you didn’t have a gun that night? A. I made a statement and signed it.”
 

 At this point defense counsel objected to the propounding of further questions regarding the statement. The court overruled the objection; and in bill of exceptions No. 8 complaint is made (1) that the prosecution was attempting to force appellant to incriminate himself as to the commission of another crime, and (2) was endeavoring to impeach his testimony by using the very statement which the court had previously held, on objections by the State, to be inadmissible in evidence. We find no merit in the complaint. As to the first ground urged, ordinarily evidence of an independent crime is inadmissible; but this general rule yields to the exception that it is admissible when relevant to an important issue in the case. State v. Jones, 174 La. 1074, 142 So. 693. The question of whether or not appellant had a pistol in the picture show and pulled it on Silket was one for the jury’s consideration and of much importance ; to determine it affirmatively would support the theory of the State,, while otherwise that of the defense would be aided. Regarding the other ground, the fact that the self-serving, exculpatory statement of the accused could not be offered in evidence in his own behalf does not affect or alter the general rule that the veracity of a defendant under cross-examination may be impeached the same as-that of any other witness. An accused is-not compelled to take the stand as a witness; but if he does he is subject to all of the rules that apply to other witnesses and may be cross-examined upon the whole case. Article 462 of the Louisiana Code of Criminal Procedure; State v. Walker, 204 La. 523, 15 So.2d 874. And one of the methods for discrediting a witness is by showing (either through cross-examination or by other witnesses) that he has at another time stated the opposite of that to which he testifies. Greenleaf on Evidence, Volume 1, 16th Edition, Section 461 — f; State v. Bellard, 132 La. 491, 61 So. 537; State v. Pousson, 134 La. 279, 63 So. 902; State v. Sikes, 149 La. 75, 88 So. 693.
 

 Bills of exceptions 9 and 10 were reserved when the court overruled defense objections to the following questions propounded, at different times, by the district attorney to the accused: “You had sense enough to do that, didn’t you?” “When
 
 *156
 
 you had sense enough to do that, you knew what you were doing then, didn’t you?” It is said by defense counsel “that these questions were not only illegal and unlawful, but were also improper, unfair and contemptous, and were calculated to confuse, bewilder and harass defendant and to hold him in contempt and ridicule in the presence of the jury.” Standing alone, the questions would appear to be quite unfair and prejudicial. They were proper and relevant, however, for the accused had previously testified, in answering several questions, that at the time of cutting decedent “he was dizzy after the lick on the head” (when struck with the billy), “was out of my mind at the time, I think”; and the State had the right to closely examine him for the purpose of showing, by his answers to other questions, that he was normal and knew what he was doing throughout the difficulty.
 

 Bill of exceptions No. 11 is based on one of the grounds discussed in connection with bill No. 8, namely, that the State was attempting to contradict appellant by using the statement that he made in the district attorney’s office. As previously said, the court did not err in its ruling.
 

 Near the close of the State’s cross-examination of the accused, as well as near the end of the trial, the question was asked: “You jugged him with the knife; you murdered him?” Before appellant could answer, his counsel objected and asked for a bill (bill No. 12). The judge immediately ruled and announced, “The jury will disregard it; that is not evidence. Strike it from the record, Mr. Reporter.” And in his per curiam he states that he is satisfied the jury did disregard the question and that it had no effect on their deliberations. There appears no good reason to doubt the judge’s belief that the question played no part in the jury’s verdict, especially in view of the court’s promptness in giving the instruction and also since the accused had admitted the actual cutting.
 

 But defense counsel argue here that such question along with many others propound* ed represented a determined effort on the part of the district attorney to harass and persecute the accused and to prejudice him with the jury. It is true that the accused was subjected to a long and thorough cross-examination, and the prosecutor was relentless and persistent in his questioning; but, as the record discloses, this in a large measure was due to the evasiveness of the witness in answering. And we agree with the remarks of the trial judge that: “The case was vigorously, bitterly and vehemently contested by both sides, but I know of no unfair or improper methods resorted to by either side.”
 

 Bill of exceptions No. 13 was taken to the ruling of the judge in permitting Lt. John Walsh of the Police Department to testify in rebuttal concerning the statement made by the accused in the district attorney’s office, the purpose of the testimony being to impeach the credibility
 
 *157
 
 of appellant. Previously, the latter, while on the stand, had been warned by the State of its intention to impeach by showing that he had made inconsistent admissions to Superintendent Reyer. The grounds urged for the defense objection were (1) that the court had refused defense counsel the privilege of introducing the statement in evidence, and (2) that the testimony sought to be elicited was not rebuttal evidence. The first ground has heretofore been considered. and discussed under bills Nos. 8 and 11. As to the second ground, evidence offered for the purpose of discrediting a defendant’s testimony is properly receivable in rebuttal. State v. Augusta, 199 La. 896,
 
 7
 
 So.2d 177. Hence, the overruling of the objection was correct.
 

 Also, while on the stand in rebuttal, Lt. Walsh was questioned by the State as to the condition of the shirt admittedly worn by the appellant at the theatre. Defense counsel objected on the ground that the evidence was not in rebuttal, insisting, that it should have been offered by the State in chief. On the objection being overruled bill of exceptions No. 14 was reserved. The ruling was correct. The shirt was of no importance in the trial of the case until the accused testified that as a result of Brunet’s striking him on the head with the billy he was knocked down, rendered dizzy, and had blood all over his face and shirt and in his eyes. When this testimony was given, which created the issue of whether or not the accused was badly beaten by Brunet, it was proper for the State to offer the shirt in evidence in rebuttal for the purpose of showing that there was no blood on it and, thereby, disproving the claim of severe mistreatment.
 

 . Bill of exceptions No. 15 was taken to the overruling of appellant’s motion for a new trial. The motion contains a reiteration of the numerous objections urged by counsel during the course of the proceedings, all of which we have herein-above discussed. Also, it charges that the verdict is contrary to the law and the evidence; and in this court, under the motion and bill, defense counsel analyze at length the evidence in the case and argue that “the jury failed to give appellant the benefit of a reasonable doubt which was dearly and manifestly created by the testimony and evidence adduced during the trial.” This argument calls in question the sufficiency of the evidence on which the accused was convicted. Under our well-settled jurisprudence we cannot pass upon the sufficiency of the proof in a criminal case where there is some evidence adduced, no matter how little, on which a verdict of conviction can be predicated; that is a matter with which the trial judge or the jury, as the case may be, is exclusively concerned. State v. Davis, 208 La. 954, 23 So.2d 801 (and decisions therein cited.) Of course a question of law is presented, determinable by us, when there is no legally admitted evidence at all of a fact essential to a conviction; but our thorough study of the in
 
 *158
 
 stant record, including all of the testimony elicited, does not reveal the existence here of that condition.
 

 The conviction and sentence are affirmed.