95 So.2d 619

**STATE of Louisiana**

**v.**

**Edwin H. SBISA.**

No. 43365.

April 1, 1957.

Rehearing Denied May 6, 1957.

Byrnes & Wallace, Bernard J. Fonseca, New Orleans, for defendant-appellant.

Jack P. F. Gremillion, Atty. Gen., M. E. Culligan, Asst. Atty. Gen., Leon D. Hubert,

Jr., Dist. Atty., Malcolm V. O'Hara, First Asst. Dist. Atty., Louis Fenner Claiborne, Asst. Dist. Atty., New Orleans, for appellee.

FOURNET, Chief Justice.

The defendant, Edwin H. Sbisa, was charged in an indictment returned by the grand jury on March 1, 1956, with malfeasance in office, as denounced by R.S. 14:134,[1] the accusation being, in substance, that from the twentieth of May, 1953, to the first day of February, 1954, the defendant, then Captain of the Third District Police Station in the City of New Orleans, intentionally refused and failed to arrest members of the New Orleans Police Department under his authority and command, knowing that such police officers and other persons were committing public bribery, and permitted the said police officers to intentionally fail in their lawfully imposed duty to refrain from committing public bribery and taking no action to prevent or hinder such commission of public bribery. Prescription was expressly negated.

The indictment was quashed by the trial judge, Section A of the Criminal District Court for the Parish of Orleans, on motion of defendant based on the prescription of one year provided by R.S. 15:8,[2] but on appeal to Appellate Division No. 2 of the Criminal District Court the judgment of the trial court was reversed [3] and the case went to trial on the merits in Section E. [4] The defendant was convicted and sentenced to the maximum penalty provided by law in such cases, i. e., to pay a fine of $500 and serve six months in jail, and he prosecutes this appeal, assigning as error the action of the court in (a) denying the motion to quash on the ground of prescrip-

1. "Malfeasance in office is committed when any public officer or public employee shall:
   "(1) Intentionally refuse or fail to perform any duty lawfully required of him, as such officer or employee; or
   "(2) Intentionally perform any such duty in an unlawful manner; or
   "(3) Knowingly permit any other public officer or public employee, under his authority, to intentionally refuse or fail to perform any duty lawfully required of him, or to perform any such duty in an unlawful manner. * * *" R.S. 14:134.

2. In so far as here pertinent, R.S. 15:8 declares that, except in the case of certain named crimes (not including malfeasance in office), "No person shall be prosecuted, tried or punished for any offense * * * unless the indictment, information, or affidavit for the same be found or filed within one year after the offense shall have been made known to the judge, district attorney or grand jury having jurisdiction; * * *."

3. Appellate Division No. 2 was composed of three members, Judges Frank T. Echezabal, J. Bernard Cocke, and Niels F. Hertz, all of whom filed carefully considered written reasons in support of their conclusions; Judge Hertz was in disagreement with the majority view and expressed the opinion that the judgment of the trial court should be affirmed.

4. Defendant's application to this Court for writs was denied. See No. 43010 on the Docket of this Court.

tion, (b) denying the portions of defendant's motion for a bill of particulars in which he sought names of persons who conveyed knowledge to defendant of the public bribery said to exist or particulars as to the manner in which defendant received the knowledge with which he was charged; (c) allowing evidence of the existence of a system of graft in the Third District prior to the time defendant was assigned there and prior to the time charged in the indictment; (d) refusing the request of the defendant for production of a statement made by the main prosecuting witness to Assistant Superintendent of Police Guy Bannister in order that the witness might refresh his memory with respect to the contents thereof touching on a material aspect of the offense charged; and (e) denying the defendant's motion for a new trial, since there was neither circumstantial nor direct evidence to show that the defendant had knowledge of activity which would require the exercise of his official function. In the aforesaid relative order, Bills of Exception numbered 1 through 5 were reserved.

■ It would appear that there is merit in Bill of Exception No. 4, found under "(d)" in the above assignment of errors. The main prosecuting witness, Sergeant John Edward Bray, while under cross examination, admitted making a statement to Guy Bannister, Assistant Superintendent of Police, in connection with

the investigation which culminated in the indictment under which defendant is being prosecuted, which statement was reduced to writing; and after having first testified that he did not recall telling Bannister that he had a conversation with the defendant relative to the system of graft existing in the Third District nor whether in that statement he had in fact told Bannister that there were no such discussions between him and the defendant, and having stated that he had not been presented with a copy, he was asked whether a copy would refresh his memory and he said it certainly would, whereupon the defendant called for production of the statement; however, the Court maintained the objection raised by the District Attorney, who invoked decisions of this Court in the cases of State v. Vallery, 214 La. 495, 38 So.2d 148; State v. Williams, 216 La. 419, 43 So.2d 780, and State v. Labat, 226 La. 201, 75 So.2d 333, and to that ruling of the court the Bill was reserved. As pointed out by this Court in the case of State v. Weston, 232 La. 766, 95 So.2d 305, "* * * the pronouncements in the Vallery, Williams and Labat cases that the defense is not entitled to production of any written statement of a witness in the hands of the district attorney, appear to be too broad * * *." It would seem that the interests of justice would be better served by having allowed this witness to refresh his memory with respect to a matter very

material to a successful prosecution. This is particularly so because the State was relying solely on the testimony of the witness Bray to show knowledge by the defendant of the alleged graft being engaged in by his subordinates. Cf. Gordon v. United States, 344 U.S. 414, 73 S.Ct. 369, 97 L.Ed. 447.

■ However, we prefer not to rest our decision on that Bill of Exception. Because of the first and fifth assignments of error, forming the subject matter of Bills of Exception Nos. 1 and 5, all of the evidence adduced on trial of the cause, both on motion to quash[5] and on trial on the merits, had to be read, and we are in full accord with the judgment of the Appellate Division of the Criminal District Court reversing the judgment of the trial judge quashing the indictment, for, as was aptly stated by the Presiding Judge in his written reasons, *"There is neither in the report of the Special Citizens Committee nor in the testimony of the witnesses in these proceedings a single reference, suggestion, or suspicion that Captain Edwin H. Sbisa had knowledge that public bribery was being committed by police officers and other persons within the jurisdiction of the Third District Police Station, * * * nor does the record contain anything even suggesting that Captain Sbisa had committed malfeasance in office so as to put the District Attorney or the Grand Juries on inquiry."* (the foregoing italics and others in this opinion are supplied), and on the merits, we are constrained to hold that there is no evidence of any probative value from which a conclusion can be drawn that the defendant had knowledge of the alleged public bribery that was being committed in his district by his subordinates and other persons.

■ Unquestionably, in the trial of a misdemeanor the trial judge is the sole

---

5. The defendant, in an effort to discharge the burden which was his (see State v. Oliver, 196 La. 659, 199 So. 793) to show that the alleged offense had been "made known" to a proper officer or the grand jury more than one year before the indictment was returned, relied entirely on the contents of a report delivered to the Hartson grand jury in April, 1954—available since that time to successive grand juries as well as to the present District Attorney who took office on May 4, 1954. The said report, covering investigation of the New Orleans Police Department by the Special Citizens Investigating Committee of the Commission Council of New Orleans, known as the SCIC or "Kohn" Report, is assembled according to subject matter into six volumes and contains allegations of police bribery in connection with the conduct of various illicit pursuits said to flourish without police molestation in the different police districts of the City, including the Third. Evidence on the motion to quash was composed of this report, excerpts from which were relied on as substantiating the defendant's claim, and the testimony of certain witnesses, among them two district attorneys and foremen of grand juries, to the effect that the report had received most careful study and there had been exhaustive hearings in an effort to trace every lead contained therein.

judge of the facts of the case, as to which this Court has no appellate jurisdiction (La.Constitution of 1921, Article 7, Section 10); however, under the jurisprudence of this Court, when there is a total lack of evidence to support a fact essential to a valid conviction, then a question of law arises [6] and it is the duty of this Court to reverse the conviction.

■ As pointed out by the trial judge in his Per Curiam to Bill of Exception No. 5, the defendant was not charged with the crime of having accepted bribes, but with the crime of malfeasance as defined by R.S. 14:134, which makes it a crime for "any public officer or employee to intentionally refuse or fail to perform any duty lawfully required of him or for any public officer or public employee to knowingly permit any other public officer or public employee under his authority to intentionally refuse or fail to perform any duty lawfully required of him, etc." It necessarily follows that to be guilty of the offense of malfeasance it was necessary for the evidence to show that Captain Sbisa had knowledge that Bray and others were accepting bribes from gambling establishments in the Third District—for it is obvious that if he had no such knowledge he could not intentionally fail to arrest them for doing so, or intentionally permit them to fail in their duty to refrain from accepting bribes.

During the course of the trial the State called eleven witnesses to the stand; of this number, nine testified that they had committed public bribery while members of the police department—seven being still on the payroll with the same rank held at the time of the offense,[7] and one of those seven, Sgt. Fritcher, having stated he was promised security of his job if he testified. Of the nine who admitted to the commission of the offense, five were under the supervision of the defendant at one time or another during the time he served as Captain of one of the platoons of the Third District Police Station, i. e., between the dates of May 20, 1953, and February 1, 1954. Not a single witness, however testified that he had ever conveyed to the de-

---

6. See State v. Thomas, 224 La. 431, 69 So.2d 738; State v. Mattio, 212 La. 284, 31 So.2d 801, certiorari denied 332 U.S. 818, 68 S.Ct. 145, 92 L.Ed. 395; State v. Davis, 208 La. 954, 23 So.2d 801; State v. Nomey, 204 La. 667, 16 So.2d 226; State v. Dow, 203 La. 707, 14 So.2d 610; State v. Martinez, 201 La. 949, 10 So.2d 712; State v. Wilson, 196 La. 156, 198 So. 889; State v. Russell, 161 La. 167, 108 So. 324; State v. Dunnington, 157 La. 369, 102 So. 478; State v. Giangosso, 157 La. 360, 102 So. 429; State v. Gani, 157 La. 231, 102 So. 318; State ex rel. Fernandez v. Perez, 151 La. 526, 92 So. 45.

7. Those who testified to having committed public bribery were Sgt. John Edward Bray, Sgt. Philip F. Fritcher, Lt. Louis L. Dumaine, Sgt. Harlan H. McGee, Joseph C. Parker (no longer employed by the Police Department), Officer Edward G. Kennedy, Thomas A. Clavin (dismissed in March, 1953), Lt. Clifford LeBlanc, and Officer John Zarinski.

fendant the knowledge that there was a system of collecting money from gambling and lottery operations for "protection," or saw defendant receive a part; in fact, most of those admitting participation testified that the distribution was never handled openly, even among the men, and that as to the defendant especially, the matter was carried on in concealment; the witnesses denied having ever received any instructions not to make arrests in cases of law violation. On the contrary, the testimony shows that defendant instructed his subordinates to make arrests on all gambling places.

According to the record, the full control of the system of bribery that existed in the Third District until the spring of 1955 was in Sgt. John Edward Bray, the main prosecuting witness; it was he who directed collections, set the amounts to be paid, divided the proceeds and handled the distribution, having undertaken the project in 1951 upon the death of a man named Lacalie. Under Bray's direction Sgt. Fritcher, on his day off and dressed in civilian clothing, would call at locations to which he had been directed by Bray and would collect various amounts previously agreed to between Bray and the operator of the establishment, which cash money Fritcher would take to Bray's home. According to his testimony, Bray would divide the amount into three equal parts, would place a third in a large white envelope on which he wrote "Captains," would divide a third among the ranks, including the sergeants and lieutenants, and place the amount for each in a brown coin envelope marked with his name, and would enclose a third in a paper or a large white envelope marked for the First, Second or Third Platoon. The envelope marked "Captains" was placed in the general mail basket on the desk in the office used by the captains —but also used as an interrogating room and generally available to any one for use of the telephone, interviews, etc. The small brown envelopes were handed to the individuals by Bray or left in a drawer of the desk sergeant's desk, each platoon having a separate drawer for its use, or sometimes were placed in the hall mail box located outside the sergeant's office, which was also the place where the lump sum for each platoon was left, to be divided by the men equally among themselves according to number. When officers, patrolmen or sergeants were assigned to the Third District they were not immediately included in the division but a period would pass until Bray felt they could be trusted. For his services Fritcher was given $5 a week; Bray kept $10.

During the period of defendant's assignment to the Third District it was under the jurisdiction of three captains per working day: Aaron Harris, William Clark, and the defendant. An average of about 65 men assigned to duty in the Third District

during that time were divided into three platoons operating in eight hour shifts, each under the jurisdiction of a separate captain and with a lieutenant for each shift. Bray stated that he never placed the envelope in the captain's office while any captain was present nor did he ever see a captain take the envelope; and on direct examination denied ever having discussed the matter with any of the the captains. At this point the District Attorney pleaded surprise, claiming that the witness had testified differently before the grand jury; the Judge then remarked to the witness, *"You had better search you memory. You may face a prosecution for perjury."* After a recess Bray was asked again on direct examination whether or not he had ever put any of this money on the captains' desk while they were in the office, to which he answered "Not to my recollection," and whether he had had any kind of discussion or conversation with any captains regarding this money, to which he answered, "I don't recall;" whereupon the District Attorney read a series of questions and answers thereto given by Bray before the grand jury,[8] and with this to refresh his memory the witness admitted talking to the captains; and in answer to the question "What is your best recollection of talking to every captain?" answered, "To the best of my recollection is that when a captain would come in he'd say *'Carry on like you have been doing.'* " On cross examination, however, he admitted never having had any conversation with the defendant other than the fact that the defendant had said "Carry

8. The questions and answers were the following:

"Q. — You take the opposite from this that each captain over you that you had a discussion with? A. — Yes sir.

"Q. — Can you name some of them to me? A. — That would be each one.

"Q. — You told us at that time the captain was in the office? A. ⇒ Yes sir.

"Q. — Can you remember what captains were in the office at the time you put it in the tray at different times, you understand? A. — No, I don't know what ones were there.

"Q. — First, understand, going back to what you mentioned a while ago, would you give a positive statement you have discussed the matter of graft with all the captains? A. — Sometimes, with one or the other.

"Q. — You make the positive statement that you have discussed the matter of the distribution of graft with all the captains? A. — That is right, sir, but before I didn't want to divulge to you all of that.

"Q. — There is no qualifications? A. — No sir, there is no qualifications.

"Q. — You talked about it with all the captains? A. — At some time or the other.

"Q. — At some time or the other with every captain while you were collecting? A. — Yes sir, correct sir.

"Q. — As far as you are concerned you believe that they knew exactly what kind of money it was? A. — Yes sir.

"Q. — They knew the system? A. — Yes sir.

"Q. — Your testimony now is that you did talk to every captain? A. — To the best of my recollection as they come in."

on like you have been doing," stating "I heard that at roll call, and if [when] a new captain would come in he'd introduce himself and say carry on like you have been doing and if there is any changes I will notify you by order." In answer to the question, "You're talking about what any captain would do; I am speaking about Captain Sbisa specifically, do you recall?" he replied, "Can't definitely positively say so." It was then stipulated that this witness was under another captain and in another platoon from the time defendant was assigned to the station (May 20, 1953) to December 31, 1953, was never in the platoon of which Captain Sbisa had charge until the first of January, 1954, when he, the defendant, changed over; that he did not, while in another platoon, take any orders or instructions from Captain Sbisa, nor was he present at roll call of defendant's platoon; and on cross examination he again flatly denied placing the envelope in the office while a captain was there, or having ever talked about the matter to the defendant.

The trial judge nevertheless concluded that the testimony as a whole established the guilt of the defendant of the crime charged in the indictment. He pointed out: "As is provided by Section 16 of Act 301 of 1946, a member of the police department of the City of New Orleans is charged with the obligation 'to preserve the public peace, to prevent crimes, detect and arrest offenders (and) * * * enforce and prevent the violation of all laws and ordinances in force in said City,' etc.," and observing "As a commander of a district, he [Captain Sbisa] had the means and authority to enforce disciplinary measures upon his subordinates to prevent the commission of said crime or to have detected its commission as it was his duty to do," reasoned that "In view of the evidence adduced by the State, to say that Captain Sbisa had no knowledge of the commission of the crime of public bribery by his subordinates, or that he was without the means of acquiring such knowledge, as would have prevented or detected its commission, is incompatible with the facts of life as they are lived by a ranking police officer of some thirty years' experience within the department."

■ ■Unfortunately, we are not informed of the "facts of life as they are lived by a ranking police officer with some thirty years' experience within the department," nor are we informed by the trial judge what his knowledge thereof comprises, since it is not based on any evidence in the record; and while it is elementary that it is within the province of the trial judge to use any process consonant with reason and logic in evaluating evidence upon the trial of the case, we know of no law that authorizes him to inject his own knowledge of facts dehors the record when there is a total lack of evidence. To carry to its

logical conclusion the reasoning of our learned brother below, the entire higher echelon of the Police Department, including the Mayor, under whose jurisdiction the Department operates, could well be charged with the offense of which he, the the trial judge, convicted this defendant, for surely they are all possessed with the means and authority to enforce disciplinary measures upon their subordinates as well as to detect and prevent the commission of crime.

For the reasons assigned, the judgment appealed from is annulled and set aside and the defendant is ordered discharged.

McCALEB, J., concurs in part and dissents in part with written reasons.

HAMITER and HAWTHORNE, JJ., dissent with written reasons.

McCALEB, Justice (concurring in part and dissenting in part).

Assuming that the proper foundation was laid (see State v. Weston, 232 La. 766, 95 So.2d 305), appellant would, in my opinion, be entitled to a new trial on his Bill of Exceptions No. 4, which was taken to the ruling of the court in refusing to require the State to produce the statement which had been given by the main prosecuting witness, Sergeant John Edward Bray, to Guy Bannister, Assistant Superintendent of Police.

On the other hand, I cannot subscribe to the ruling of the Court discharging appellant on the theory that no evidence whatever was adduced at the trial below to sustain the charge of malfeasance in office, in that appellant intentionally refused and failed to arrest members of the Police Department under his authority and command, knowing that such officers were committing public bribery and knowingly permitted them to fail to perform their duty to refrain from committing public bribery.

Since the record is replete with evidence that a system of public bribery was being conducted at the third precinct station of New Orleans during appellant's service there as one of the Captains, it is manifest that the only question which the judge was called upon to decide was whether appellant knew of the system and intentionally failed in his duty to enforce the law. This involved a determination of a pure question of fact as our law plainly provides that intent or guilty knowledge " * * * need not be proven as a fact, it may be inferred from the circumstances of the transaction". See Article 445 of the Code of Criminal Procedure (R.S. 15:445) and State v. Leonard, 162 La. 357, 110 So. 557.

By concluding in the instant case that the trial judge was without right to infer that, in view of all the circumstances disclosed by the evidence, appellant must have been aware of the graft system being literally conducted under his nose, I respectfully

suggest that the majority is reversing the lower court on a question of fact and thus is assuming appellate jurisdiction which does not reside in this Court by the specific provisions of Section 10 of Article 7 of the Constitution.

In addition, I feel impelled to note again, as I did in my dissenting opinion in State v. Harrell, 232 La. 35, 93 So.2d 684, that, although the contention that there is no evidence to sustain the verdict is presented by way of a bill of exceptions taken to the overruling of a motion for a new trial (to which is attached all of the evidence adduced below), the appellant is ordered discharged when, under his own plea, the best he should obtain is a new trial. Since the court persists in this practice, it seems to me that a new procedural method, such as a demurrer to the evidence, should be devised so that the pleadings in these cases will conform to the orders rendered.

HAMITER, Justice (dissenting).

The bill of exceptions found by the majority to have merit, and as a result of which they have decreed a reversal of the conviction and sentence, presents, in my opinion, purely a question of the sufficiency of the evidence. Of such a question we have no jurisdiction.

Therefore, I respectfully dissent.

HAWTHORNE, Justice (dissenting).

I do not think that there is any merit in Bill of Exception No. 4. In my view, the defendant in a criminal case is not entitled to the production of a prior written statement of a State's witness in the hands of a police officer or the district attorney simply because on cross-examination by the defense the witness answers in the affirmative the question of "whether a copy would refresh his memory".

In State v. Weston, 232 La. 766, 95 So. 2d 305, to which the majority opinion in the instant case refers, this court in discussing Bill of Exception No. 6 reserved there made it clear that the defense is entitled to the production of a prior written statement of a State's witness in the hands of the district attorney or the police only where a proper foundation for the impeachment of the witness has been laid by a showing that the statement sought is contrary to the sworn testimony of the witness, and that when such a foundation is laid, production of the document can be had for the purpose of impeachment.

In the instant case, however, the majority opinion does not say that a foundation was laid to impeach the witness by a showing that the witness had made prior inconsistent statements.

I dissent also from the holding of the majority on Bills of Exception Nos. 1 and 5. The reasons for disagreeing with the majority given by Justice McCALEB in his concurring opinion are correct, and I fully agree with his views on these bills.