THE STATE BAR OF NEVADA, Plaintiff *v.* FIORE
· RAFFETTO, Attorney at Law, Defendant.

No. 3482

July 16, 1947.                    183 P.2d 621.

*Harlan L. Heward,* of Reno, for Plaintiff.

*Clyde D. Souter,* of Reno, for Defendant.

## OPINION ·

By the Court, BADT, J.:

This proceeding was initiated in this court by the filing herein by the defendant of a pleading entitled as above and denominated "Application by the Defendant for Review of the Report, Findings and Recommendations of the Board of Governors of the State Bar of Nevada, filed January 25, 1947 in the above entitled Court." The findings referred to were as follows:

"1. The Board of Governors finds that the said Accused, Fiore Raffetto, did, in Reno, Nevada, on July 16, 1946, pay the sum of $30 to one Peter James Howton Rogers, for forwarding a divorce client to said Accused, and that said Accused remunerated said Peter James Howton Rogers for soliciting and obtaining professional employment for said Accused, and that said Accused did directly share with an unlicensed person, to wit Peter James Howton Rogers, compensation arising out of and incidental to professional employment.

"2. The Board finds that said Accused, Fiore Raffeto, did in Reno, Nevada on July 17, 1946, pay the sum of $30.00 to one Peter James Howton Rogers, for forwarding a divorce client to said Accused, and that said Accused remunerated said Peter James Howton Rogers for soliciting and obtaining professional employment for said Accused, and that said Accused did directly share with an unlicensed person, to wit said Peter James Howton Rogers, compensation arising out of and incidental to professional employment."

The recommendations were that defendant be suspended for a period of six months on count one and six months on count two and until the further order of the court, and that the two terms run concurrently, and that during the period of suspension the defendant be restrained from practicing law until reinstated. The report referred to the prior proceedings, findings and recommendations of the local administrative committee of the state bar of Nevada in and for Washoe County culminating in the recommendation of that committee that defendant be suspended from practice in Nevada for one year on each count, running consecutively. In other words, the board of governors, in effect, reduced to six months the two-year penalty recommended by the local committee.

■   We are first concerned with the insistent reliance of the defendant upon the function of this court as outlined by SANDERS, J. in Re Scott, 53 Nev. 24, 31, 292 P.

291, 292. This has to do with the contention that the findings of the local administrative board and the findings of the board of governors in the matter reviewed cannot be considered as persuasive or as a matter of fact considered as having any weight whatsoever. The language of Justice SANDERS in the Scott case is as follows:

"1. The first question to arise is: What is meant by the term 'review' as used in this and other sections of the act? We are in accord with the authorities holding that the Supreme Court, on review of a decision of disbarment or suspension of an attorney by the Board of Governors of the state bar, is not bound by findings or recommendations made by a local administrative committee, nor their adoption by the Board of Governors, and shall examine the entire record anew to ascertain whether or not any charge has been proven which merits disbarment or suspension, uninfluenced in whole or in part by the action taken by the board or committee. In re Stafford [208 Cal. 738], 284 P. 670; In re Shattuck [208 Cal. 6], 279 P. 998; McVicar v. State Board of Law Examiners, D.C., 6 F.2d 33, 35."

It must be noted in this regard that the statement thus made by the court was a preliminary statement in the court's discussion of the constitutional question involved. The contention had been made that section 26 of the state bar act, Comp. Laws, sec. 565, violated section 1 of article III of the constitution relative to the distribution of the powers of government in that the section conferred upon the board of governors judicial power with respect to the suspension or disbarment of attorneys. It is quite evident that the determination by the court of this "first question" was for the purpose of showing that the final act of suspension or disbarment was the act of the court itself; that such purpose was made clear by the proviso: "Nothing in this act contained shall be construed as limiting or altering the powers of the courts of this state to disbar or discipline members of the bar as this power at present exists"; that it is clear that

the findings of the board of governors or the local administrative committee are merely recommendatory and not final, and do not and cannot amount to a judgment of disbarment or suspension.

This is the more clear from an examination of the three authorities referred to by Mr. Justice SANDERS. In fact his statement uses the precise words used in McVicar v. State Board of Law Examiners, D.C., 6 F. 2d 33, 34. The only question raised in that case was the constitutionality of the Washington statute, which did as a matter of fact give finality to the order of suspension or disbarment made by the board of governors. The court did hold that such provision was unconstitutional, but that sections of the act were separable and that the remaining sections did not transgress any constitutional limitations. It is significant that the court in that case (which was a bill for an injunction to restrain the disbarment proceedings) ordered the bill dismissed as being without equity. The reason for this was that the supreme court of Washington, despite the finality given by the statute to the order of the board of governors, treated that order as a report of an intermediary agency and held that the order finally entered by the court "reflected the independent judgment of the court, uninfluenced either in whole or in part by the action taken by the board." Here again it will be seen that the reference to the independent action of the court was for the purpose of showing its right to review the record independently and make a final determination, so that its jurisdiction was not merely appellate in character.

The same situation applies to the two California cases cited by this court. In the Shattuck case the term "review" as used in the act was held not to bear the limited significance attributed to the "writ of review or certiorari" as used in the California Code of Civil Procedure, sec. 1067 et seq., so as to narrow the powers of the court to the single issue of jurisdiction, but that the review contemplated consisted in "a reexamination by

this court of the entire record of the proceedings before said board * * *." [208 Cal. 6, 279 P. 999]. It was further held that the powers of the board of governors under the act possessed "no * * * finality whatever in effecting the disbarment or suspension." The California act, like our own, provided for the striking of the attorney's name from the rolls if the decision of the board of governors "be affirmed." The same section adhering to the inherent powers of the court to discipline members of the bar is also found word for word in the California statute. The court recites that it is manifest that the only orders intended to have the effect of working the disbarment, suspension, etc., are the final orders made by the court under the act, and that any decision made by the board of governors is "merely recommendatory in character, and has no other or further finality * * *." It was accordingly held that the legislative intent was not to invest the board "with any powers which can be said to possess the finality and effect of judicial orders," and that the constitutional restriction was therefore not violated. The court then makes this significant statement: "We are satisfied that such recommendation is justified by the facts of the case." The finding that the recommendation of the board "is justified by the facts," and the presence in the Nevada statute as well as in the California statute of the provision for "affirming" the decision of the board, hardly indicate that the board's findings should be totally ignored.

In the Stafford case [208 Cal. 738, 284 P. 671] the supreme court of California said: "This court is not bound by the findings or recommendations made by the Local Administrative Committee, nor their adoption by the Board of Governors, and will examine the record anew to ascertain whether or not any charge has been proven against the petitioner which merits disbarment." The purpose of reviewing the three authorities relied upon by Mr. Justice SANDERS in the quotation from his opinion in Re Scott supra, is to determine to what

extent the learned justice (DUCKER, C. J., concurring, and COLEMAN, J., dissenting) intended to go in such statement. As we have seen, its chief purpose was undoubtedly to relieve the statute of any charge of a constitutional infringement. The defendant, on the other hand, insists that its effect is to deprive the findings of the local administrative board and the board of governors of any effect or weight whatsoever. Counsel for the state bar of Nevada concedes frankly that the court is not bound by the decisions of the local administrative committee or the board of governors, but insists that the decision of two such bodies is entitled at least to persuasive weight and quotes from two later California authorities as follows:

"Ordinarily the findings of the Local Administrative Committee which have been approved by the Board of Governors will be followed by this court, although it is not bound thereby." Moura v. State Bar of California, 18 Cal.2d 31, 112 P.2d 629, 630.

"And while the findings of the fact finding body are not binding on this court, they 'should be accorded persuasive force' and 'should be entitled to great weight' in this proceeding." Lindenbaum v. State Bar of California, 26 Cal.2d 565, 160 P.2d 9, 12.

How literally and in what sense are we to accept the statement of SANDERS, J., that this court's examination of the entire record to ascertain "whether or not any charge has been proven which merits disbarment or suspension" should be "uninfluenced in whole or in part by the action taken by the board or committee?" We cannot bring ourselves to believe that this language was intended to be construed (in view of the purposes of the holding) as meaning that the recommendation of the local committee concurred in by the board of governors should be ignored, that it might as well for all intents and purposes be expunged from the record except insofar as to show that there was a compliance with the procedural requirements of the act.

Webster's International Dictionary, Second·Edition, Unabridged (1935), gives as one of the synonyms of the noun "influence" the word "control." Another synonym given is "mastery." Another is "effect." A synonym of the verb "influence" is "determine." Another is "induce." We are inclined to think that it is in one of these more restricted meanings that the word was used in the opinion of Mr. Justice SANDERS, and particularly that he used it in the sense of "control." This was all that was necessary to satisfy the constitutional question there at issue. In no sense was it to be understood that the recommendations of the committee or the board could "control" the action of this court, in which alone may lie the authority to make a final decision of disbarment or suspension. The later California cases, decided long after the Shattuck and Stafford cases cited in the Scott case, reiterated the rule, as we have seen, that the findings of the committee and the board should be accorded persuasive force and should be entitled to great weight. As the supreme court of California, despite its decisions in the Stafford and Shattuck cases cited by Mr. Justice SANDERS, continues to feel that the findings of the board are persuasive, we are the more convinced that the freedom from the "influence" of the board or committee, as mentioned by Judge SANDERS, means nothing other than the court's freedom from the "control" or "controlling influence" of the findings or recommendations of either or both boards. The integrity of purpose of both boards is frankly granted by the defendant. It would be placing a great strain on the ratiocination of this court to attempt entirely to ignore the conclusions of a board of nine lawyers (the record shows "a quorum" present), constituting a local administrative committee, and a board of nine more lawyers (the record shows two absent) constituting a board of governors, when it is conceded that all of such men are honored members of the bar, freely and generously giving their time to a most unpleasant task. We accordingly approach our independent review of the record

under the rule, which we hereby reaffirm, that ours must be an independent judgment, not controlled or bound by either the findings of fact or recommendations of either board, but prepared to accord persuasive force to the findings of fact and recommendations of the local administrative committee and the board of governors.

■ This court, as well as the local administrative committee and the board of governors, would be most naive if it pretended ignorance of the long prevailing and unabated rumors of the scandal of the so-called "divorce racket" in certain parts of the state. The local committee properly initiated an investigation. It found that from January 2, 1945, to December 31, 1945, the defendant had filed and tried 308 divorce cases. From January 2, 1946, to July 24, 1946, he had filed and tried 271 divorce cases, or a total of 579 cases in a little over one and one-half years. These figures cover Washoe County only. The testimony of the defendant's secretary indicates that he also handled many divorce cases in other counties. In the number of divorce cases filed and tried, he was exceeded by only one attorney. Several other attorneys approached the record more or less closely. The development of the situation from this point is then pictured by defendant's counsel substantially as follows: That the committee and its investigator devised a plan to entrap the defendant, pursuant to which a taxicab driver (a man formerly employed by naval intelligence) was to enter the office of the defendant, offer to bring a divorce client to him for compensation, then to produce a woman as such client and to return later for payment; that this was to be repeated a second time with a second "client"; that two police officers, having first searched the taxicab driver to be certain that he had no money on his person, were to follow him and the "client" in each instance for the purpose of being able to testify as to the money transactions and to handle certain marked money given to the two women with which they were to pay retainers to the defendant, having in view that the defendant might pay the taxicab driver with a part of the retainers in the

marked money. Counsel for the state bar do not contradict this statement on behalf of the defendant. Defendant bitterly assails such a situation, but it does not become necessary for the court to comment upon it. Our task is simply to review the entire matter, including all of the testimony and the documentary evidence, and to determine whether the evidence was sufficiently clear and convincing to justify the findings of fact of the local administrative committee and the board of governors and to justify similar findings on our part, or to determine that the evidence is such as to warrant a determination of this court that the charges should be dismissed.

Witnesses testifying before the local committee included the defendant, Peter James Howton Rogers, Allen Glass, James Morsberger, Betty Barr, Gladys Petrie, Harlan L. Heward and Louise Carl. (There was no trial de novo before the board of governors—the defendant having addressed a letter to such board stating that he did not desire a trial de novo.) Rogers, the taxicab driver, testified to having made an arrangement with the defendant under which the latter was to pay Rogers money for bringing divorce clients to the defendant; that later he brought him two clients and in each case was paid $30. This is categorically denied by the defendant. Betty Barr and Gladys Petrie were the two "divorce clients" in the case. Only the former appeared to testify personally before the local administrative committee. Glass and Morsberger were detective sergeants of the Reno police department. In each case mentioned in the findings the "divorce client" paid the defendant in marked bills. In each case Rogers testified that defendant paid him $30 for bringing the client. In one of these cases one of the marked bills was paid. Other bills were identified by the numerals and letters appearing thereon. The police officers testified to their being in constant contact with Rogers from the time he entered defendant's office without any money on his person to the time he left such office and immediately handed the officers the money.

The defendant's case is based upon his attack upon the credibility of the witnesses, upon discrepancies in their testimony and upon the entire nature and scope of the investigation, including the employment of "stooges" and the laying of a trap for the defendant. Defendant's application for review states:

"At this point it is stated in all candor to this Honorable Court that no one questions in the slightest degree the integrity, purity of purpose, and desire to be fair on the part of the excellent young men comprising the local Administrative Committee of the State Bar in and for District No. 6, nor the ultimate purity of purpose of their Investigator. They are not responsible for drawing the State Bar Act, which constitutes such a Committee grand jury, prosecutor's detectives, judge, even witnesses and petty jury. It is simply that the history of human conduct furnishes few precedents to justify such confidence in human nature."

Such attack has been made in many cases. Section 34 of the state bar act, Comp. Laws, sec. 573, authorizes the local administrative committee, on its own motion and without the filing of any complaint, to initiate and conduct investigations of all matters relating to the practice of the law or the discipline of the members of the state bar or any other matter within the jurisdiction of the state bar, and to take evidence touching the matters under investigation and to try and hear such matters, compel the attendance of witnesses and the production of documents, etc. Rules VI and VII of the rules of procedure of the state bar, approved by this court, authorize the appointment of examiners or prosecutors to be selected from the active members of the state bar who are not members of the board of governors or the committee and who serve without compensation. It is the duty of the examiner to investigate grievances referred to him by the committee.

In McVicar v. State Board of Law Examiners, D.C., 6 F.2d 33, the court said:

"It was also argued with vehemence that the statute

is void because it authorizes a member of the board to prefer charges against an attorney, and then to sit as a member of the board for the consideration of the charges so preferred. Verification of the formal charges in disbarment proceedings by a member of the board of law examiners charged with the duty of taking evidence and reporting thereon to the Supreme Court of the state raises no presumption of unfairness in the proceedings, and in nowise invalidates the statute, since such power is expressly conferred by the statute in dealing with a matter of great public concern in which the members of the board have no personal interest."

Defendant urges that the proceedings in the instant case, however, went far beyond the scope of rules VI and VII of the rules of procedure of the state bar and section 34 of the state bar act in that here the local administrative committee devised a scheme whereunder a member of the bar would be induced to commit unethical conduct in order that he should be penalized as a result, and that this constitutes a "sorry spectacle upon which this court should place its stamp of disapproval." Should the board of governors of the state bar of Nevada promulgate new or different rules of procedure and submit the same to this court for approval, the procedure under attack by the defendant might then be considered. In passing, it may be noted that both the statute and rules of procedure are copied from those in effect in many other jurisdictions.

In the case of In re Winters, 40 Nev. 335, 163 P. 244, 245, in which the bar association had recommended disbarment on the ground that defendant had altered an affidavit of service of summons in a divorce action, this court said:

"While we think it safe to say that the evidence showed the change in the proof of service, as contended, there is a lack of proof going to show that respondent was responsible for the change, or in fact knew of it. Against the circumstantial evidence of the prosecution

is the positive testimony of respondent. When we consider the fact that another attorney was interested in the case, the former good repute of respondent, and his positive testimony that he did not make the change or know of it, we think the evidence insufficient to sustain the charge."

And in the case of In re Clarke, 46 Nev. 304, 212 P. 1037, 1038, this court further said:

"If Clarke made the inquiry attributed to him and was serious in making it, we might well find that he, as an attorney at law, had wilfully attempted to induce informant, as city attorney, to use his office for an unlawful purpose. Such action would amount to gross misconduct warranting his disbarment. But in view of the state of the evidence in this regard, we are unable to say that the allegation is proven. The burden of proof was on the informant. On account of the highly penal nature of a judgment of disbarment, affecting so adversely the whole future of an accused, courts will not disbar on doubtful evidence, or where there is substantial conflict in it."

Defendant places great reliance upon these cases and insists that by reason of the testimony of the defendant denying the charges and by reason of the apparent discrepancies in the testimony of the witnesses called by the local committee and by reason of the nature of the institution and prosecution of the charges as pointed out, we should, following the statements of law above quoted, hold that the evidence is so doubtful and the conflicts in the testimony so substantial that the proceedings should be dismissed. If we found here merely circumstantial evidence contradicted by the positive testimony of the defendant as in the Winters case, or a substantial conflict of the evidence under the circumstances appearing in the Clarke case, or if we were left unconvinced that the findings of the local administrative committee and of the board of governors were justified by the evidence submitted to them and now before this

court for independent review, we could indeed come to the same conclusion reached by the court in those two cases. Being satisfied, however, that the evidence is sufficiently clear and convincing to justify the finding that in each of the instances mentioned the defendant paid the taxi driver for producing the divorce client, the principles enunciated in the Winters and Clarke cases do not apply.

We cannot but commend counsel for defendant for his zeal in presenting this case. It is always a moving drama when a respected and honored member of this bar comes to the relief of an old friend and fellow lawyer and conscientiously devotes his energies and his talents to an attempt to avoid the stigma of disciplinary action by the bar and the court. But neither such sympathy nor the age of the defendant nor his prior reputation can justify any other conclusion than the one reached.

It is ordered that the defendant be suspended from practicing law in all of the courts in this state for a period of six months from the date of entry of this order.

HORSEY, J., concurs.

EATHER, C. J., because of illness, is not participating in the foregoing case.