109 So.2d 896

**STATE of Louisiana**

v.

**Freddie DANIELS.**

No. 44267.

Dec. 15, 1958.

On Rehearing March 23, 1959.

Gravel, Humphries, Sheffield & Mansour, Alexandria, for defendant-appellant.

Jack P. F. Gremillion, Atty. Gen., M. E. Culligan, Asst. Atty. Gen., Richard Kilbourne, Dist. Atty., Clinton, for appellee.

TATE, Justice.

Defendant was convicted of a violation of Article 122 of the Criminal Code (LSA–R.S. 14:122), "Public Intimidation", and sentenced to five years in the State Penitentiary.

■ Defendant appeals from said conviction upon the sole ground that there was a total absence of any evidence as to his guilt of the crime charged. This question is raised by a bill of exceptions reserved as to the trial court's denial of defendant's motion for a new trial following his conviction,[1] to which bill the entire transcript of testimony was attached.

An examination of the evidence attached to the bill discloses that the incident forming the basis of this charge occurred on February 22, 1958, when defendant was a convict inmate at the State Penitentiary at Angola. (He has since been paroled.) On the evening in question, according to Otis Edwards, a correctional officer in charge of defendant's dormitory, defendant was out of line on the way to the evening

[1]. The only other bill of exception reserved was to the trial court's overruling of defendant's motion in arrest of judgment, also based upon the alleged total absence of any evidence to prove an essential element of the crime. Properly speaking, the motion in arrest of judgment lies only for a substantial defect patent on the face of the record which can be ascertained without an examination of the evidence. LSA–R.S. 15:517, 518; State v. Capaci, 179 La. 462, 154 So. 419, at syllabi 29–31.

meal. Defendant having ignored Edwards' instructions to go to the end of the chow line, Edwards testified he grabbed defendant by the upper arm, following which defendant swung and hit him. This use of force upon the prison guard by defendant is the basis of the present criminal charge.

The crime of "Public Intimidation" is defined by Article 122 of the Criminal Code as follows:

"Public intimidation is the use of violence, force, or threats, upon any of the following persons, *with the intent to influence his conduct in relation to his position, employment, or duty:*

"(1) Public officer or public employee; or

"(2) Grand or petit juror; or

"(3) Witness, or person about to be called as a witness upon a trial or other proceeding before any court, board or officer authorized to hear evidence or to take testimony; or

"(4) Voter or election official at any general, primary, or special election.

"Whoever commits the crime of public intimidation shall be fined not more than one thousand dollars, or imprisoned, with or without hard labor, for not more than five years, or both." (Italics ours.)

Conceding that the evidence shows defendant used force upon Edwards[2] and that Edwards was a public employee, counsel for defendant nevertheless urges that the conviction should be set aside because there is a total absence of evidence to prove that defendant hit Edwards "with the *intent* to influence his conduct in relation to his position, employment, or duty." (Italics ours.)

The State argues that only general criminal intent must be proved to support a conviction: that is, the reasonable and probable result of defendant's battery upon the prison guard under the circumstances being (it is argued) to influence the conduct of that public employee with regard to his duties, defendant is presumed to have contemplated these ordinary and natural consequences of his battery when he committed same. LSA–R.S. 14:8(2) ("general criminal intent"); cf. State v. Johnston, 207 La. 161, 20 So.2d 741.

It is further pointed out that "though intent is a question of fact, it need not be proven as a fact, it may be inferred from the circumstances of the transaction," LSA–R.S. 15:445. We are reminded of the well settled jurisprudence that " 'It is only where there is no evidence at all upon some essential element of crime charged that [the court] may set aside a verdict.' * * * But 'Where there is some evidence

2. Which may, for instance, have proved commission of a simple battery, LSA– R.S. 14:35, punishable by up to two years in the parish prison. (Italics ours.)

to sustain the conviction, no matter how little, this court cannot pass upon the sufficiency thereof. That comes within the exclusive province of the trial judge and jury,'" State v. McDonell, 208 La. 602, 23 So.2d 230, 231.

■ Pretermitting entirely whether the disciplinary problems of penal institutions were ever intended by the legislature to be within the purview of the statute, the State's contention that the crime of public intimidation may be committed with general criminal intent and without specific criminal intent is untenable.

Article 11 of the Criminal Code (LSA–R.S. 14:11) provides:

"The definitions of some crimes require a specific criminal intent, while in others no intent is required. Some crimes consist merely of criminal negligence that produces criminal consequences. However, *in the absence of qualifying provisions,* the terms 'intent' and 'intentional' have reference to 'general criminal intent.'" (Italics ours.)

■ The statutory definition of the crime of the public intimidation provides

that it is the use of force upon a public employee "with intent *to influence his conduct in relation to his position, employment, or duty.*" (Italics ours.) The italicized provisions ("to influence", etc.) qualify the intent statutorily required to commit the crime defined.[3] The statutory crime is thus not the intentional use of force or threats upon a public employee, but *rather* the use of force or threats upon him with the specific intent to influence his conduct in relation to his duties.

Specific criminal intent is defined by Article 10(1) of our Criminal Code (LSA–R.S. 14:10(1)):

"Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender *actively desired* the prescribed criminal consequences to follow his act or failure to act." (Italics ours.)

It is contradistinguished from general criminal intent, which exists "when the circumstances indicate that the offender, in the ordinary course of human experience, must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act," Article 10(2), Criminal Code (LSA–R.S. 14:-10(2)).

---

3. The Reporter's Comment to Article 11, Criminal Code, specifically lists as an illustration of a specific intent the commission of an offense "with intent to defraud." It is appropriate to take into consideration these reporters' comments to the Criminal Code, which have legislative sanction, in the interpretation and construction of the articles therein. State v. Broadnax, 216 La. 1003, 45 So.2d 604; State v. Brown, 214 La. 18, 36 So.2d 624; State v. Truby, 211 La. 178, 29 So. 2d 758.

In short, specific intent is present when from the circumstances the offender must have subjectively desired the prohibited result; whereas general intent exists when from the circumstances the prohibited result may reasonably be expected to follow from the offender's voluntary act, irrespective of any subjective desire to have accomplished such result.

Applied to the present case, it was necessary for the State to prove that the defendant "actively desired" when he hit the prison guard "to influence his conduct in relation to his position, employment, or duty."

There is a total absence of any evidence in the record as to this requisite specific intent on the part of defendant. The testimony of the prosecuting witness, Edwards, indicates simply that the defendant struck him, crying "No, you don't push me around, not here," when said witness grabbed defendant by the upper arm to repeat his instructions to the latter to go to the end of the line.[4] This prosecuting witness on cross-examination candidly admitted that the defendant did not strike him to induce him to do or not to do anything.[5] (The only other witnesses testify-

4. Edwards' full account of the incident is as follows:
"Well, on this particular evening I was turning out for feed. They have a rule down there that they will line up in a single line, single file going to chow, and they must hold that line, and in case that one breaks the line we tell him to get back in line, and in case he don't, why, we have the authority to send them to the tail-end of the line before chow. This evening Freddie Daniels was out of the line out in the middle of the road, passing the whole line. I told him twice to get back in line. Well, he didn't get in line and I went up the walk, overtaken him and took him by the upper part of his arm right here at the shoulder and told him to go to the tail of the line. At that time, he shoved me on the shoulder and said, "No, you don't push me around, not here," and drawed his fist back to hit me.
"Q. What happened then? A. Well, at that time, when I seen that he was going to hit me and had started his swing, well, I swung, too, to knock his lick off to protect myself.

"Q. Well, what happened? A. Well, we both hit, and he knocked me to my knees and hands, and when I got up, he started down the walk, and I told him that—and I told him that was all right. I immediately went to the phone and called Captain D. J. Derrick, my supervisor. (Tr. 14–15)
     *          *          *          *
"Q. To recapitulate your testimony, was that when you took hold of him to try to make him go to the end of the line? A. Well, when I taken ahold of him on the arm and told him to take the end of the line, that's when he shoved me and told me that I wasn't shoving him around there and drawed back to hit me.
"Q. Did he at any time go to the end of the line as you ordered him to? A. No, sir.
"Q. That's all." (Tr. 18)

5. Edwards' testimony concerning this is at Tr. 17–18, as follows:
"Q. Well, I say, what was he trying to make you do? Was he trying to make you do something—give him something or hand him something or— A. No, I told him to go to the end of the line—back to the tail end of the line.

ing as to the event—all convicts or former convicts testifying on behalf of defendant, whom it was well within the province of the trial court to disbelieve—told of an unprovoked attack on the defendant on the part of the prison guard.) Defendant's specific intent to commit the statutory crime cannot be presumed from the naked fact that he hit the prison guard.

"Where a specific intent is an element of a crime, the specific intent must be proved as an independent fact and cannot be presumed from the commission of the unlawful act," 22 C.J.S. Criminal Law § 32, p. 91. See: Morissette v. United States, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288; 1 Wharton's Criminal Evidence (12th ed., 1955) Section 131 at p. 244.

"The intent with which a harmful act is done is usually not expressed in words, and the jury is permitted to draw such inferences of intent as are warranted under all the circumstances of the particular case, *but there is no presumption of law, either conclusive or disputable, that an act was done with any specific intent,* unless some statute provides for such presumption in the trial of a particular offense," Perkins, Criminal Law (1957) p. 674. (Italics ours.)

■ The State's argument that the trial court's apparent determination that the defendant specifically intended by hitting the prison guard to influence his conduct presents a non-reviewable factual matter, overlooks that such inference under the circumstances of this case and the legal principles above enunciated is unjustified and cannot as a matter of law prove the State's case. A specific intent cannot be presumed from an unlawful act which does not naturally bespeak the intent. Anderson, Wharton's Criminal Law and Procedure (1957) Section 60, pp. 135-6. As stated in a leading case on the subject, Hubbard v. United States, 9 Cir., 1935, 79 F.2d 850 at page 853: "The color of the act determines the complexion of the intent only

"Q. What was he trying to make you do, though, Mr. Edwards? A. Well, I don't know that. He just shoved me and told me I wasn't shoving him around there. That's all.

"Q. Was he trying to do anything to influence you to do something? A. Well, he wouldn't go to the end of the line when I told him to go to the end of the line. He shoved me back and told me I couldn't shove him around there—

"Q. Was he trying to make you do something for him? A. Well, I don't know if he was.

"Q. Well, if he wasn't trying to make you do anything for him, this happened just because of him standing out there in line, and you wanted him to get back in. Is that right? A. No, he wasn't standing in the line.

"Q. Standing out of the line? A. He was out of the line. He was going up the walk when I overtook him and told him to go to the end of the line.

"Q. He didn't come up to you and try to make you do anything, did he? A. No, sir, he wasn't supposed to.

"Q. But he didn't do that, did he? A. No, sir."

in those situations where common experience has found a reliable correlation between a particular act and a corresponding intent." The instantaneous and angered blow by defendant herein responsive to the guard's shove does not by itself reliably indicate the requisite specific intent to commit the serious crime with which defendant is charged.

Thus, in disposing of somewhat similar legal contentions in State v. Nomey, 204 La. 667, 16 So.2d 226, where we set aside a conviction of a storekeeper for unlawfully keeping alcoholic beverages *for sale* in a dry parish, we held that the only evidence in the transcript was that the whiskey, wine, and beer were kept in the living quarters in the rear of the store and that there was no evidence whatsoever of any proven facts or circumstances tending to show that the defendant was keeping such alcoholic beverages *for sale*. See In re Glassberg, 230 La. 396, 88 So.2d 707 (conviction of juvenile as a delinquent for having committed an aggravated battery set aside because no factual proof whatsoever of the requisite general intent, i. e., the intentional pulling of the trigger.) Cf., also, State v. Fulco, 194 La. 545, 194 So. 14.

The case of Simpson v. State, 1921, 81 Fla. 292, 87 So. 920, 922, furnishes a pertinent illustration of the appellate review of proof of specific intent. In that case, a conviction of breaking and entering a dwelling house with "intent to commit rape" was set aside because although the breaking and entering *was* proved, the requisite *specific* intent was not proved and was not reasonably to be inferred under the circumstances therein from the mere fact that the defendant broke into a woman's bedroom. See also Banovitch v. Commonwealth, 196 Va. 210, 83 S.E.2d 369, Hargrove v. United States, 5 Cir., 1933, 67 F.2d 820, 90 A.L.R. 1276.

In conclusion, there is a total absence of evidence as to facts and circumstances surrounding the battery committed by the defendant upon the public employee from which it might reasonably be inferred that such battery was committed with the specific criminal intent to influence the employee's conduct with regard to his duties within the meaning of the Public Intimidation article (Art. 122) of the Criminal Code. There being a total absence of proof as to this essential element of the crime with which defendant is charged, the conviction must be set aside and the defendant ordered discharged. State v. La Borde, 234 La. 28, 99 So.2d 11. See, also: State v. Sbisa, 232 La. 961, 95 So.2d 619, State v. Harrell, 232 La. 35, 93 So.2d 684.

For the foregoing reasons, the judgment appealed from is annulled and set aside and appellant is ordered discharged.

HAWTHORNE, J., dissents.

McCALEB, J., dissents with written reasons.

McCALEB, Justice (dissenting).

Appellant has been discharged in this case for the stated reason that there was no evidence submitted to show that the violence used by him in striking the public officer or public employee was with the specific intent of influencing the employee's conduct in relation to his position or duty, as required by Article 122 of the Criminal Code (R.S. 14:122).

In my opinion, this finding of a lack of proof of specific intent is the determination of an issue of fact, of which we are without jurisdiction under Section 10 of Article 7 of the Constitution. Obviously, proof of a general intent or specific intent can rarely be shown by direct evidence and, hence, it is the function of the jury (in this case the judge), as the trier of facts, to determine from all of the other evidence whether the alleged unlawful act was accompanied by that state of mind which exists "when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act" as provided by R.S. 14:10.

It is not for this Court to say whether the essential element of intent was present as it is not our province to decide the question of guilt or innocence. This right is specially conferred on the jury by Section 9 of Article 19 of our Constitution which declares that "The jury in all crim-

inal cases shall be the judges of the law and of the facts on the question of guilt or innocence, having been charged as to the law applicable to the case by the presiding judge."

For this reason alone, the common-law authorities cited in the majority opinion are inapplicable. Those authorities, which deal with presumptions of law as to specific intent, are not pertinent here. Indeed, the point presented here is answered contrary to the majority opinion in the portion of its quotation from Perkins, Criminal Law (1957) p. 674, which it has not italicized, thus: "The intent with which a harmful act is done is usually not expressed in words, and the jury is permitted to draw such inferences of intent as are warranted under all the circumstances of the particular case, * * *". Our statutory law contains similar provisions. Article 445 of the Code of Criminal Procedure (R.S. 15: 445) declares that " * * * for though intent is a question of fact, it need not be proven as a fact, it may be inferred from the circumstances of the transaction". See also State v. Leonard, 162 La. 357, 110 So. 557.

I, of course, acknowledge that the instant majority view is not the first time in which this Court has decided criminal cases on questions which I conceive to be factual issues. It was done in State v. Harrell, 232 La. 35, 93 So.2d 684 and State v. Sbisa, 232 La. 961, 95 So.2d 619. State v. Nomey,

204 La. 667, 16 So.2d 226 is, in my estimation, a borderline case which probably is in the same category.

On the other hand, State v. La Borde, 234 La. 28, 99 So.2d 11, is clearly distinguishable. In that matter, a prosecution for having carnal knowledge of an unmarried female over 12 years of age but under the age of 17, the State did not offer any evidence to show that the female was unmarried. This was an element of the crime which the State was required to definitely establish by direct evidence. It could not be inferred, as is true of intent, from the facts and circumstances of the case.

I respectfully dissent.

### On Rehearing

HAMLIN, Justice.

On original hearing, we set aside the conviction and sentence of defendant for the crime of "Public Intimidation," holding that at the time of the occurrence of the alleged misconduct, defendant, a convict inmate at the State Penitentiary, did not have the specific intent required for the commission of the crime charged.

Two bills of exceptions were reserved during the course of trial. On this rehearing, we shall consider Bill of Exceptions

No. 2,[1] reserved to the denial of defendant's motion for a new trial, in which motion he alleged:

"* * * there was no evidence of any nature whatsoever adduced upon trial hereof to justify a conviction under the provisions of [LSA-] R.S. 14:-122 since there was no evidence of any kind with respect to defendant, Freddie Daniels, using any violence, force or threats upon any of the persons enumerated in said article with the intent to influence his conduct in relation to his position, employment or duty."

All evidence taken during the course of trial is annexed to Bill of Exceptions No. 2. The pertinent testimony with respect to the crime herein charged is as follows:

"Q. Tell the Judge what happened, Mr. Edwards. [Correctional Officer at Angola State Prison] A. Well, on this particular evening I was turning out for feed. They have a rule down there that they will line up in a single line, single file going to chow, and they must hold that line, and in case that one breaks the line we tell him to get back in line, and in case he don't, why, we have the authority to send them to the tail-end of the line before chow. This evening Freddie

1. Bill of Exceptions No. 1 was reserved to the trial court's overruling defendant's motion in arrest of judgment.

Daniels was out of the line out in the middle of the road, passing the whole line. I told him twice to get back in line. Well, he didn't get in line and I went up the walk, overtaken him and took him by the upper part of his arm right here at the shoulder and told him to go to the tail of the line. At that time, he shoved me on the shoulder and said, 'No, you don't push me around, not here,' and drawed his fist back to hit me.

"Q. What happened then? A. Well, at that time, when I seen that he was going to hit me and had started his swing, well, I swung, too, to knock his lick off to protect myself.

"Q. Well, what happened? ' A. Well, we both hit, and he knocked me to my knees and hands, and when I got up, he started down the walk, and I told him that—and I told him that was all right. I immediately went to the phone and called Captain D. J. Derrick, my supervisor.

\* \* \* \* \* \*

"Q. What was he trying to make you do? Was he trying to make you do anything or was he just standing out there in line? A. No, he wasn't in line. He was out of the line.

"Q. Well, I say, what was he trying to make you do? Was he trying to make you do something—give him something or hand him something or— A. No, I told him to go to the end of the line—back to the tail end of the line.

"Q. What was he trying to make you do, though, Mr. Edwards? A. Well, I don't know that. He just shoved me and told me I wasn't shoving him around there. That's all.

"Q. Was he trying to do anything to influence you to do something? A. Well, he wouldn't go to the end of the line when I told him to go to the end of the line. He shoved me back and told me I couldn't shove him around there—

\* \* \* \* \* \*

"Q. *He didn't come up to you and try to make you do anything, did he? A. No, sir, he wasn't supposed to.*

"Q. *But he didn't do that, did he? A. No, sir.*

\* \* \* \* \* \*

"Q. Did he at any time go to the end of the line as you ordered him to? A. No, sir.

\* \* \* \* \* \*

"Q. Now, do you remember—He drew back to hit you, and you drew back to hit him—Do you remember who hit first or anything like that? A. *Well, we hit about the same time.*" (Emphasis ours.)

Posed for our determination is the question of whether or not the above described conduct constitutes "Public Intimidation" and is prohibited by LSA–R.S. 14:122, which reads:

"Public intimidation is the use of violence, force, or threats upon any of the following persons, with the intent to influence his conduct in relation to his position, employment, or duty:

"(1) Public officer or public employee; or

"(2) Grand or petit juror; or

"(3) Witness, or person about to be called as a witness upon a trial or other proceeding before any court, board or officer authorized to hear evidence or to take testimony; or

"(4) Voter or election official at any general, primary, or special election.

"Whoever commits the crime of public intimidation shall be fined not more than one thousand dollars, or imprisoned, with or without hard labor, for not more than five years, or both." [2]

Under the "Comment" of Article 740–122, Louisiana Code of Criminal Law and Procedure,[3] we find the following:

" * * * The public intimidation article includes the same parties and requires the same purpose as that article. [Public Bribery] The principal differences in the two articles is the method used to accomplish the purpose. Also voters and election officials are included.

"The words 'violence, force, or threats' should include threats of harm or injury to the character of the person threatened as well as actual or threatened physical violence."

Preceding LSA–R.S. 14:118, "Public Bribery," we find Sub-Part B., "Bribery and Intimidation." Thereunder, is quoted the following:

"Comparison of prior criminal law. Dale E. Bennett, 5 La.L.Rev. 6, 45 (Dec. 1942). Mr. Bennett stated:

" 'Existing bribery statutes were numerous and confusing. The new Code correlates and combines all these various special statutes in one general article (section) on public bribery, which embraces the bribery of public officers or employees, election officials, jurors, and witnesses. Upon a suggestion of the Advisers, bribery of voters was made a separate and lesser offense. Bribery is defined to include the giving or receiving, and also the promising or soliciting, of a bribe. The intent element of the offense is simply

---

2. The defendant was sentenced to serve five years in the State Penitentiary.

3. This article is identical to LSA–R.S. 14:-122.

stated. It is enough that the bribe was given or offered "with the intent to influence his (the recipient's) conduct in relation to his position, employment, or duty." The action induced need not be corrupt or illegal. The buying or selling of appointments to office, or extra payments to induce a public officer or employee to do what he is already legally bound to do, would clearly constitute public bribery.

" 'Public intimidation includes the same parties and requires the same intention as public bribery. The principal distinction between the two offenses is the method employed to accomplish that purpose. The phrase "violence, force, or threats" is broad enough to include threats of injury to character as well as threats of physical violence.

" 'The public bribery and public intimidation articles (sections) are supplemented by two special articles (sections) which cover a related type of improper conduct particularly affecting jurors. Any attempt to influence jurors in respect to their verdict, except in the regular course of the trial, will constitute jury tampering; while any

4. "This court has previously pointed out that the comments to the various articles of the Criminal Code, printed as footnotes, have legislative sanction, and that it is appropriate and proper to take into consideration these comments in en-

juror who intentionally permits such undue influencing or pledges his verdict will be guilty of jury misconduct.' " 4

In arriving at an answer to the question posed, supra, we must adhere to the rules laid down for the interpretation of criminal statutes, namely:

" * * * Nothing is a crime under our law which is not made so by statute. The court cannot by construction make that a crime which is not expressly made so by the Legislature. In the language of Chief Justice Marshall (United States v. Wiltzberger, 5 Wheat. [76] 95, 5 L.Ed. [35] 37), 'It would be dangerous, indeed, to carry the principle that a case which is within the reason or mischief of the statute is within its provisions, so far as to punish a crime not enumerated in the statute, because it is of equal atrocity or of kindred character with those which are enumerated.' On the same subject, Bishop, Stat.Crimes, § 220, quotes from Hawkins as follows: 'No parallel case which comes within the same mischief shall be considered to be within the purview of the statute unless it can be brought within the meaning of

deavoring to interpret and construe the provisions of the articles found therein. See State v. Davis, 208 La. 954, 977, 23 So.2d 801." State v. Broadnax, 216 La. 1003, 45 So.2d 604, 609.

the words.' * * *" State v. Fontenot, 112 La. 628, 36 So. 630, 635.

"It has long been the unshaken rule of this State that penal statutes must be strictly construed and cannot be extended to cases not included within the clear import of its language." State v. Viator, 229 La. 882, 87 So.2d 115, 117.

"Important to consider here, moreover, is the well settled principle that in a criminal prosecution the statute on which it is based must be strictly construed and any doubt as to its interpretation must be resolved in favor of the accused. State v. DeGeneres, 194 La. 574, 194 So. 24; State v. Gehlbach, 205 La. 340, 17 So.2d 349; State v. Truby, 211 La. 178, 29 So.2d 758." State v. Bowden, 220 La. 13, 55 So.2d 764, 767. Cf., State v. Palanque, 133 La. 36, 62 So. 224.

"Criminal laws are strictly construed; only those acts are offenses which are clearly made so by the language of the statute, which cannot be extended further. LSA–R.S. 14:7; * * *" State v. Jones, 220 La. 381, 56 So.2d 724, 726.

"Criminal laws are stricti juris, and this Court has consistently refused to usurp legislative prerogatives by supplying definitions omitted in such statutes. * * * State v. Penniman, 224 La. 95, 68 So.2d 770, 771.

"Courts can do no more than interpret and construe statutes. They cannot, under the guise of interpretation, assume legislative function. * * *" State v. Murtes, 232 La. 486, 94 So.2d 446, 448.

" * * * It is too well settled to need reference to authority that penal laws must be construed strictly in accord with their letter, and that a wrong which does not come within the letter of such a law does not subject the offender to the penalty." State v. Hebert, 179 La. 190, 153 So. 688, 689.

A review of the evidence, supra, shows that the defendant became indignant and resented correctional officer Otis Edwards' admonition. He exhibited an attitude of resentment. The defendant spoke back to the officer, after twice receiving an order, and then drew his fist back to hit the officer. At this point, the officer hit the defendant and at the same time the defendant hit the officer.

Webster's New World Dictionary of the American Language, College Edition, defines "Resent" as follows:

" * * * to feel or show displeasure and indignation at (some act, remark, etc.) or toward (a person), from a sense of being injured or offended."
In 77 C.J.S. Resentment, p. 283, defined as:

"A feeling of indignant displeasure because of something regarded as a

wrong, insult, or the like; umbrage. * * *"

Webster's New World Dictionary of the American Language College Edition defines "Influence" to mean:

" * * * to exert or have influence on; have an effect on the nature or behavior of; affect the action or thought of; modify."

State Bar v. Raffetto, 64 Nev. 390, 183 P. 2d 621, 624, states:

" * * * A synonym of the verb 'influence' is 'determine.' Another is 'induce.' " See, 43 C.J.S. Influence p. 382; State v. Hurd, Wash., 105 P.2d 59, 61; Loewer v. Arkansas Rice Growers' Co-op Ass'n, 180 Ark. 484, 22 S.W.2d 17; Texas & N. O. R. Co. v. Brotherhood Ry. & S. S. Clerks, 281 U.S. 548, 50 S.Ct. 427, 74 L.Ed. 1034.

The evidence reflects that the resentment of the defendant displayed itself in a spontaneous act of mild violence and nothing more. It does not contain any showing that the resentment and mild violence were for the purpose of influencing the conduct of the officer in relation to his position, employment, or duty. Under the comments quoted, supra, it is pointed out that the crime of "Public Intimidation" requires the same purpose as that of "Public Bribery," the only difference being in the method employed. The conduct of the defendant as set forth in the evidence is not even akin to that expressed by the commentators. We conclude that the evidence is devoid of circumstances which show a violation of LSA–R.S. 14:122.

To extend the statute to the present situation would be tantamount to allowing the State to do what the law and jurisprudence reprobates; i. e., to punish defendant by extending the application of a State law to a case and circumstances not intended by the lawmakers. A reading of LSA–R.S. 14:122 provokes the thought that the article could not possibly apply to the instant case and the defendant herein, an inmate of the State Penitentiary. It goes without saying that, rather than charge defendant with the commission of a felony, the disciplinary rules and procedure of the penitentiary should have been invoked and enforced.[5]

5. The incident involved occurred on February 22, 1958; the defendant was released from the penitentiary in April, 1958; the bill of information herein was filed on May 9, 1958. On trial, the defendant testified as follows:

"Q. You were released from the penitentiary. When was that? A. I was released in April.

"Q. This matter was'nt brought up on your record, was it? A. No, sir, it wasn't.

"Q. You weren't charged with any offense? A. No, sir.

"Q. This was more or less a matter between you and Mr. Edwards, wasn't it? A. Yes, sir, because at the time they. said there wasn't anything to it. I also

· "The superintendent, subject to the approval· of the governor, *shall make all rules and regulations necessary* for the government of the penitentiary and all its departments. * * * The superintendent shall also enact rules for the grading and classifying of the convicts according to the most modern and enlightened system of reformation, the assignment and character of work, the prohibition of harsh or cruel punishment, the right of a convict to communicate directly with the superintendent without interference of an officer, *the purpose being to restore and reform the individual to a better man, physically, intellectually, and morally."* LSA–R.S. 15:854.. (Emphasis ours.)

" * * * And there is, incident to the office of prison officials, a power to make reasonable rules and regulations for the government of prisoners, and to inflict punishment for the infraction of such rules. * * *" 41 Am.Jur., Sec. 36, "Prisons and Prisoners," p. 910. See, 72 C.J.S. Prisons § :11, p. 862.

"The custodian of a penal institution has no arbitrary· power to select such

had my supervisor. I was going to school down there. I had an interview with him, a fellow on the Board. He is a preacher there, and he ·said that he taken notes of the whole case and he went down talking to them, if I am not mistaken, the

a mode of inflicting discipline on a prisoner as he may deem adequate, * * *" 41 Am.Jur., Sec. 37, "Prisons and Prisoners," p. 910.

■ We conclude that the conduct of the defendant was subject to the discretionary reprimand or punishment of the penitentiary authorities (such power being granted by law, supra) and was not such as would constitute a felony under LSA–R.S. 14:122.

Counsel for appellant aptly states in brief:

" * * * If this argument [that the conduct of the defendant is prohibited by LSA–R.S. 14:122] is followed to its logical conclusion, any person that resists any simple order or direction of a police officer is resisting the police officer's influence and is likewise guilty of the crime of public intimidation. We respectfully submit that such a construction of the facts presented in this case would pervert the very purpose of the Statute and bring a wealth of cases not heretofore considered pertinent within full application of the Public Intimidation Statute."

record clerk, or Mr. Walker, the security guard, and he sat on the Board like I said, and I made the Board. It wasn't— He said it wasn't even brought up on the Board down there in Baton Rouge."

Our finding that the defendant's conduct did not come within the prohibitions of LSA–R.S. 14:122 precludes the necessity of our reconsideration of the question of "Intent."

For the reasons assigned, our original decree, annulling and setting aside the judgment of the trial court and ordering the defendant discharged, is reinstated and made the judgment of this Court.

McCALEB, J., dissents with written reasons.

HAWTHORNE, J., dissents.

McCALEB, Justice (dissenting).

In reinstating its previous judgment in this case, the majority has placed its decision on the ground that Section 122 of the Criminal Code, which defines the crime of public intimidation, was not intended to embrace the acts for which appellant has been charged and convicted.

This conclusion is unsound in my opinion. The provisions of R.S. 14:122 are clear and, therefore, need not be construed or interpreted. As applied to this case, the pertinent language of the statute reads:

"Public intimidation is the use of violence, force, or threats upon any of the following persons, with the intent to influence his conduct in relation to his position, employment, or duty:

"(1) Public officer or public employee; * * *"

Appellant was charged with violating the statute in that he used force and violence upon Otis Edwards, an employee of the Louisiana State Penitentiary, with intent to influence his conduct in relation to his said employment and duty. Manifestly, this charge, which tracks the statute, satisfies legal requirements and contains all of the essential elements of the crime, (1) use of force upon a public employee and (2) with intent to influence his conduct in relation to his position.

And the facts of the case reveal that there was some evidence elicited by the prosecution to sustain each element of the offense. Edwards was shown to be an employee of the State Penitentiary in charge of prisoners; that it was his duty to require the prisoners to line up in single file at mealtime; that appellant was out of line and refused to get back in line and that, when he attempted to force appellant to do so, appellant struck him with his fist. Since appellant's act in striking the officer was doubtless an act of violence, the only other question in the case for the jury to determine was whether the violence was administered with intent to influence the

prison guard's conduct in relation to his duty. Determination of this criminal intent was, as pointed out in my dissent to the original opinion, purely a question of fact, review of which is not within the jurisdiction of this court.

Nevertheless, the majority now deduce that the Legislature never intended that the type of conduct charged against appellant would be violative of the public intimidation statute.

This holding fails to take in account that it is not for us to say what act or acts were intended to be covered by the statute—for, its provisions being explicit, the enactment is not subject to judicial construction or interpretation.

The majority ruling is far reaching because it opens the door for this Court to construe legislative intent of statutes which are clear and unambiguous. The fact that a penal law must be strictly construed does not in anywise extend the right of the court to redefine the conduct proscribed by the statute. The determination and definition of acts which are punishable as crimes is purely a legislative function which cannot be delegated to, or exercised by the courts. State v. Truby, 211 La. 178, 29 So.2d 758.

I respectfully dissent.