# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT


**04-121**


**STATE OF LOUISIANA**

**VERSUS**

**DAMIAN S. BURGESS**

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF ACADIA, NO. 61,238
HONORABLE KRISTIAN EARLES, PRESIDING
**********

**SYLVIA R. COOKS**
**JUDGE**

**********

Court composed of Sylvia R. Cooks, Elizabeth A. Pickett and Billy H. Ezell, Judges.

**CONVICTION AND SENTENCE FOR SIMPLE BATTERY AFFIRMED; CONVICTION AND SENTENCE ON COUNT ONE AND TWO OF PUBLIC INTIMIDATION ARE REVERSED AND THE SENTENCES VACATED.**

Frederick L. Welter
Assistant District Attorney
P.O. Box 288
Crowley, LA   70527-0288
(337) 788-8831
COUNSEL FOR APPELLEE:
    State of Louisiana

Edward K. Bauman
Louisiana Appellate Project
P.O. Box 1641
Lake Charles, LA   70602-1641
(337) 491-0570
COUNSEL FOR DEFENDANT/APPELLANT:
    Damian S. Burgess

**COOKS, Judge.**

The Defendant, Damian Burgess, appeals his convictions on one count of simple battery and two counts of public intimidation. For the following reasons, we affirm the conviction of simple battery and reverse the public intimidation convictions on both counts.

**FACTS**

In the early morning hours of October 21, 2001, the Defendant, Damian Burgess, was closely following his girlfriend home from work. A Rayne City Police Officer saw the two drivers commit several traffic violations. The officer followed Defendant and his girlfriend to their residence. Initially, the officer decided to drive off as both vehicles were safely stopped, but changed his mind and returned to make sure a domestic situation was not occurring. After returning to the residence, the officer approached the Defendant and asked him to come toward him and answer a few questions. Defendant refused and a struggle ensued, with the Defendant fleeing the scene. Other officers arrived on the scene, and discovered Defendant lying in some leaves in a nearby yard. When the Defendant would not cooperate with police, he was eventually sprayed with mace and arrested.

On arrival at the police station, Defendant threatened one of the officers, stating he knew where the officer lived and would get him. He continued to threaten other officers during the booking process.

Defendant was charged with aggravated battery in violation of La.R.S. 14:34, and two counts of public intimidation in violation of La.R.S. 14:122. Following a jury trial, Defendant was convicted of simple battery in violation of La.R.S. 14:35, and two counts of public intimidation. For the battery conviction, Defendant was sentenced to six months in parish jail, suspended, with a two hundred fifty-dollar fine plus court costs, and for public intimidation to three years at hard labor, two years

-1-

suspended, and three years supervised probation with special conditions.

Defendant challenges his convictions and sentences for public intimidation.

## ASSIGNMENT OF ERROR NO. 1

In this assignment of error, the Defendant contends the evidence presented at trial was insufficient to convict him of the two counts of public intimidation. He does not pose an insufficiency of the evidence challenge to his conviction for simple battery. He argues when he threatened the police officers, he did not have the specific intent to attempt to influence their conduct or duties, a necessary element of public intimidation.

> In considering questions of sufficiency of the evidence, a reviewing court must consider the evidence presented in the light most favorable to the prosecution and consider whether a rational trier of fact could have concluded that the essential elements of the offense were proven beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The reviewing court defers to rational credibility and evidentiary determinations of the trier of fact. *State v. Marcantel*, 00-1629 (La. 4/3/02), 815 So.2d 50.

*State v. Chesson*, 03-606, p. 5 (La.App. 3 Cir. 10/1/03), 856 So.2d 166, 172, *writ denied*, 03-2913 (La. 2/13/04), ___ So.2d ___.

The Defendant was convicted of two counts of public intimidation in violation of La.R.S. 14:122. That statute provides, in pertinent part:

> Public intimidation is the use of violence, force, or threats upon any of the following persons, with the intent to influence his conduct in relation to his position, employment, or duty:
>
> (1) Public officer or public employee.

Under this statute, the State was required to prove beyond a reasonable doubt on each count that the Defendant threatened the officer with the intent to influence his conduct in relation to his duty.

At trial, Rayne City Police Officer Terry Broussard testified he is a reserve officer who is commissioned as a regular city police officer. On October 21, 2001,

at 3:10 a.m., Officer Broussard was on duty when he noticed two vehicles that seemed to be traveling over the speed limit. He explained that a man was driving a truck closely behind a car being driven by a woman. The officer pulled out behind the pair of vehicles and followed the vehicles. At that point, Officer Broussard paced the two vehicles as traveling approximately fifty miles per hour in a forty mile per hour zone. He explained he could not use his radar because he was traveling at the time. Officer Broussard also testified he saw the two cars make an illegal right turn, and turned three other times without using turn signals.

Officer Broussard stated that he decided to make a traffic stop because he thought maybe the man was chasing the woman, or they were in a hurry to get home, or one of them was under the influence. He explained his eventual decision to approach the Defendant:

> At the corner of North Polk and Jeff Davis I had turned on the overhead blue lights to initiate a traffic stop. But at the point when they both turned into their driveway, my first thought was, well, they're both home safe, there was no accidents caused, so I'm just going to go on and patrol. I didn't make a complete stop. I just made a rolling stop, just kind of glancing at the yard. They were both in the driveway. But then when I -- after passing up the house, I guess you could say a light bulb clicked in my head, saying what if this is domestic violence and I'm allowing this to happen. So I went around the block, which took me approximately, I would say, five to twenty seconds. I went and made the block. I parked the vehicle, the patrol unit which I was driving, on the street at the end of his driveway. At that point I did not see the female subject; I only saw the male subject. I got out of my unit and walked over --

He clarified that he first turned on his blue lights about two blocks from the Defendant's residence.

Officer Broussard described the scene as very dark outside, but there was a street light in the area and the light next to the back door of the residence. Officer Broussard testified he was wearing his casual uniform consisting of blue fatigue pants and a black t-shirt with large white lettering stating "POLICE" on the front. He stated

he was also wearing his gun, bullet case, flashlight, nightstick, radio and his badge was visible hanging from his belt.

Officer Broussard testified he walked into the driveway and announced that he was a Rayne police officer and asked the Defendant to come toward him and answer a few questions. He stated the Defendant told him, "I know you are not talking to me, mother f_ _ _ _ _." Officer Broussard continued up the driveway to obtain the Defendant's identification and find out where the woman was located. The officer approached the Defendant on the top step to his front door. Officer Broussard testified the Defendant had his keys in his left hand and a beer bottle in his right hand. He told the Defendant he would like to ask him a few questions, if he did not mind. Officer Broussard testified the Defendant took his right index finger and poked him in the chest and said "You're going to need some help, mother f_ _ _ _ _." Officer Broussard called for backup and put his hand on the back of the Defendant's neck to keep him from going into the house. According to Officer Broussard, the Defendant then swung around and hit him in the back of the head with his fist that was holding the bottle. The men fell off the steps and wrestled in the bushes. During the struggle, Officer Broussard saw the woman approach, and noticed she seemed upset. Officer Broussard pulled out his nightstick, but the Defendant got loose and ran away. When backup officers arrived, the Defendant was found hiding across the street. The beer bottle was not recovered.

On cross examination, Officer Broussard admitted that he did not receive any report of domestic violence that night. Officer Broussard testified regarding his physical altercation with the Defendant:

Q. At no point in time once you made the stop did you ever have the opportunity to investigate the traffic violations?

A. Excuse me? I had opportunity -- I tried to make contact with the subject, okay, but he was not cooperating with me for any reason at all.

-4-

I mean he just didn't want to cooperate with me.

Q.    But you were primarily at that point in time discussing domestic violence?

A.    That is correct. I wanted to make contact with him basically to see where the female was because I did not see the female at any point, like I said earlier, until he and I entered into a confrontation.

Q.    If you're concerned about the female in the situation, why didn't you make an effort to find the female instead of confronting him?

A.    I did not see the female anywhere. My concern before he got in the house was to make contact with him, to make sure that if he knew where she was, maybe he could help me find her. I wasn't going to go looking all over for her, with the possibility that maybe he had done something, and let him get the house and get his hands on, possibly, a weapon or something or lock himself in the house. Then it would have caused more problems.

Officer John Jason Potier testified that he arrived on the scene as backup and Officer Broussard told him he had been hit in the head with a bottle and that the Defendant got away. Officer Potier and other officers that arrived on the scene found the Defendant laying in a nearby yard in some leaves. He was lying on his back with his hands behind him when he was ordered to show his hands and roll over. Officer Potier sprayed the Defendant with mace when he did not comply. A few seconds later, the Defendant complied and he was handcuffed, *Mirandized*, and taken to the Rayne Police Department. He was not belligerent with officers during the ride to the station. Once at the station, the Defendant's handcuffs were removed and he was allowed to rinse out his eyes in the bathroom.

Officer Potier testified as follows:

In the hallway of the police department, right after the bathroom, he became in a defensive manner, crouched down with balled fists. At that time he stuck his finger in my face and began threatening me at that time. At that time I removed my straight baton and extended it and ordered him to go into the booking room where he could be booked.

Q.    Do you remember anything specifically that he said to you?

A.    He was advising me that he was going to get me off duty. He

called me a "mother f_ _ _ _ _ _," and he was going to get me off duty. He knew where I lived at. And he threatened other officers while in the station, also.

Q. What happened next?

A. We went to the booking, and we thought he'd calm down after a while to be able to be booked. He refused and became violent, threatening officers at that time. At that time I advised the other officers to put him in the cell for his safety and ours, until he could either calm down or we could book him properly.

Q. How did you feel when he threatened you?

A. Well, it basically -- any time a suspect is in the police department, in custody, and still threatening police officers with bodily harm, I felt threatened. I mean it just -- there was four or five officers, and I felt threatened for myself and my family off duty.

Officer Potier stated he believed the Defendant was trying to intimidate him to drop the charges or let him go, although he noted that was not a reasonable expectation. Officer Potier stated the Defendant was being booked and was under arrest and was still threatening to harm them. Officer Potier explained:

Q. So your duties for him -- aren't you all trained to deal with this type of behavior? Isn't it common for people who feel that they have wrongfully been arrested to become angry and lose their temper?

A. It's not common for a person to be arrested and be brought to the police department and still threatening the police officers, even after he knows he's going to jail, and being charged with an offense, to still threaten a police officer with bodily harm. That's not a common thing.

Q. You don't think that being sprayed with some type of spray would cause that to happen?

A. I'm sure it would, but not to the point of threatening a police officer and several police officers.

Officer Broussard's testimony corroborated Officer Potier's testimony regarding the arrest of the Defendant and his conduct at the police station. However, Officer Broussard stated he could not remember exactly what the Defendant said at the station.

Defendant's girlfriend, Cynthia Lyons, testified on the night in question the

Defendant had been with her at the Flamingo playing pool and drinking beer while she worked. After the bar closed, Defendant was following her from work to their home as usual. She stated there was no problem between the two of them that night. Lyons testified she did not see a police car initiate a stop with his blue lights. Once in their driveway, Lyons stated she was parked next to the Defendant's truck and they discussed her going to get them something to eat. Lyons testified she was starting to back out when she saw headlights of a car pull up and a man walked up to the Defendant. She had no idea who the man was, so she opened her car door to hear what he was saying.

Lyons testified the man told the Defendant to "come here" because he wanted to talk to him. She did not hear the man identify himself as a police officer at any point. Lyons stated the Defendant was trying to unlock the three locks that secured their front door when the man continued to approach the front steps stating that he wanted to talk to him and ask him some questions. She said the Defendant had his pool cue case and a cigarette in his left hand, and had the keys in his right hand. Officer Broussard did not remember the Defendant having a pool case under his arm.

Lyons testified that after the man put his hand on the Defendant's shoulder, the Defendant turned around and said, "I don't know who you are and I don't know what you got. Don't touch me again." Lyons stated the Defendant turned around and continued unlocking the door. According to Lyons, the man suddenly charged the Defendant and they fell into the bushes. She stated the man touched the Defendant first and never saw the Defendant swing at the officer. Lyons testified she approached the man to ask him what he was doing. She said she became frightened and told the Defendant to run because she saw the man reach behind him and thought he might have a gun. She testified she did not realize the man was a police officer, because he was wearing a dark t-shirt and jeans. It was not until he stood up that she was close

-7-

enough to see that his t-shirt had the word "POLICE" written across it. She also stated she did not see a gun belt, badge or nightstick on the man. The officer did not tell her who he was or what he was investigating.

After the Defendant was arrested, Lyons went out to the street to ask the officer why he was at her house. Officer Broussard told her he thought there was a domestic dispute, but he did not say anything about the Defendant hitting him with any object. Lyons testified that it was possible that because of the darkness that the Defendant never realized the man was a police officer.

The Defendant argues that public intimidation requires the specific intent to influence an officer's conduct. He states that he was merely venting his anger as he was being harassed by the police. In his brief to this court, the Defendant admitted he threatened the two officers involved. However, he contends he did so without the specific intent to influence their conduct in relation to their duties. The Defendant contends his statements were idle threats and were not intended to influence anyone.

### Count One:

This count concerned the Defendant's alleged public intimidation of Officer Broussard. The Defendant claims his statements to Officer Broussard were idle threats and were not specifically intended to influence his conduct. The State argues the Defendant's threats were designed to make Officer Broussard leave the scene or to prevent the Defendant's arrest. La.R.S. 14:10(1) states that specific criminal intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act."

The Defendant cites *State v. Love*, 602 So.2d 1014 (La.App. 3 Cir. 1992), which held threats made to the officer were not made in an "or else" fashion and therefore, were not made with the intent to influence. In *Love*, this court stated:

Public intimidation requires specific criminal intent. "The statutory crime is . . . not the intentional use of force or threats upon a public employee, but *rather* the use of force or threats upon him with the specific intent to influence his conduct in relation to his duties." *State v. Daniels*, 236 La. 998, 109 So.2d 896 (La.1958); *State v. Hall*, 441 So.2d 429 (La.App. 2 Cir. 1983).

*Id.* at 1018.

In *Love*, officers were called to the scene of a disturbance and were told the defendant had a butcher knife and had threatened to kill his family. The defendant was apprehended on a trail near the residence. After a scuffle and a brief escape, several officers subdued and arrested the defendant. While being transported in a patrol car to the police station, the defendant threatened an officer and his family. In reversing the defendant's conviction for public intimidation, this court stated:

> Officer White testified that, while Love was being walked up the trail, the defendant threatened to kill White several times. On the way to the Sheriff's Office, Love additionally threatened to burn down White's house with his family in it. He repeated this threat several times and also spit in White's face. This testimony was corroborated by Deputy Raimond, the driver of the police vehicle. This was the only evidence presented at trial on the public intimidation charge. Viewing this evidence in the light most favorable to the prosecution, we conclude that any rational trier of fact could not have concluded beyond a reasonable doubt that the specific intent element of the crime of public intimidation was proven. Granted, the defendant was clearly angry with White and directed these serious threats toward White in an effort to vent his anger. However, this in and of itself is not sufficient to prove a specific intent on the part of Love to influence White's conduct in relation to his position, employment, or duty. The threats were directed toward White personally and his family members. There is no evidence in the record to indicate that White was in a position to grant Love lenient treatment or release from confinement. At the time, Love was handcuffed and already under arrest. Love did not indicate in any way that the threats were intended to influence White's behavior. In other words, the threats were not made in an "or else" fashion. The threats were not made with the intent to influence White in the manner prohibited by the statute. The threats made and actions taken by Love do not constitute public intimidation within the meaning and intendment of La.R.S. 14:122.

*Id.* at 1019.

The State distinguishes *Love,* stating that in the instant case the Defendant was

-9-

not under arrest and in custody when he threatened Officer Broussard, thus he could have been able to influence the officer's actions to arrest him. However, Officer Broussard testified that when he initially approached the Defendant he was merely checking the welfare of the couple, as he thought a domestic situation might be occurring. He never testified that the Defendant was subject to arrest before he made the threat.

The State relies on *State v. Jones*, 00-980 (La.App. 5 Cir. 10/18/00), 772 So.2d 788, wherein the defendant threatened an officer in order to avoid arrest. The facts quoted from *Jones* are as follows:

> At approximately 6:30 a.m. on May 17, 1998, Deputy Jennifer Wingrove of the Jefferson Parish Sheriff's Office, responded to a 911 call regarding a disturbance inside the Happy Hour Lounge at 7501 Fourth Street in Jefferson Parish, Louisiana. Deputy Wingrove, with three years of police experience, testified that the 911 call concerned a "black male [who] was threatening a female inside of the bar." The perpetrator was described as wearing a black hat, a white or white and black T-shirt, and dark colored pants. When Deputy Wingrove arrived at the bar, she noticed a Caucasian woman and man, as well as a black man standing outside in front of the bar. The black man, later identified as the Defendant, matched the description of the individual who had been threatening the woman in the bar.

> Deputy Wingrove approached the group. As she attempted to talk to them, the Defendant remarked, "I don't have to talk to you, you're not going to listen to me anyway. . . . You're white and I'm black, and you're not going to speak to me anyway, you're not going to hear anything I have to say." The Defendant left the bar and walked quickly down Jung Street.

> Deputy Wingrove continued to speak to the group. After completing the interviews, the Defendant became a suspect in the disturbance. Deputy Wingrove wanted to hear the Defendant's side of the story, so she drove around the area searching for him. She saw him near the bar and requested that he stop walking so that she could talk to him. But, the Defendant continued walking. Deputy Wingrove then pulled her car across the street to block the Defendant's path. She exited her car and told the Defendant that she would like to speak to him regarding the incident at the bar.

> Deputy Wingrove noticed a strong odor of alcohol coming from the Defendant and observed that he appeared to be intoxicated. According to Deputy Wingrove, the Defendant was belligerent, adopted

-10-

a "combative" stance, and made the following comments:

> I've been arrested before. I'll get out tomorrow and then you'll be in for it. I'll kill you. I'll f _ _ k you and eat your p_ _ _y, and then I'll set you up like I did Jeri Curl in Street Crimes, and then you can suck my big black d_ _ k, you f_ _ _ _ _g wh_ _e.
>
> Because Deputy Wingrove took the Defendant's threats seriously and feared for her safety, she removed her "nightstick" and instructed the Defendant to get into the police car. The Defendant initially hesitated, but eventually entered the car without physical resistance. The Defendant continued making "threats and comments" in the backseat until Deputy Mike Aicklen arrived on the scene. Deputy Aicklen heard the Defendant shouting at Deputy Wingrove and thought that he was intoxicated. Shortly after Deputy Aicklen arrived, Deputy Wingrove arrested the Defendant for "disturbing the peace, resisting arrest, and public intimidation."

*Id.* at 789-90.

The fifth circuit held the defendant's threats could have been for "no other reason than to prevent arrest after Deputy Wingrove had probable cause for his arrest. Deputy Wingrove had not yet done anything to defendant for which he could have been retaliating." *Id.* at 792. The court stated the circumstantial evidence showed by the defendant's words that he felt he was going to be arrested, and his threats were made to prevent that from happening. The fifth circuit distinguished the *Love* case on the basis that the defendant was already arrested and being transported to the police station when he made his threat to the police officer. The *Jones* court stated, in each case, it must be considered "whether the threats are made in anger as revenge or retaliation or whether they are made in an attempt to influence the conduct of the public officer in relation" to their duties. *Id.* at 792.

The State also distinguishes the *Love* case by citing *State v. Denham*, 01-400 (La.App. 1 Cir. 12/28/01), 804 So.2d 929, *writ denied*, 02-393 (La. 1/24/03), 836 So.2d 37. In *Denham*, the victim was the defendant's probation and parole officer who visited him in jail to investigate whether he had violated his parole. The defendant told the victim if he took any actions to revoke his probation he would make

-11-

sure something happened to him when he got out of jail. The first circuit stated:

> Relying upon *State v. Love*, 602 So.2d 1014 (La.App. 3d Cir. 1992), the defendant asserts that in order for the evidence in a public intimidation case to be sufficient to support conviction, the evidence must establish the victim in fact had the authority to give the defendant that which he was attempting to obtain through intimidation. While that case contains language supportive of this proposition, we note that the definition of public intimidation does not contain any such requirement. Thus, we need not determine whether the state established that Dillon had the authority to revoke the defendant's parole.

*Id.* at 932.

Other persuasive cases include *State v. Mead*, 36,131 (La.App. 2 Cir. 8/14/02), 823 So.2d 1045, *writ denied*, 02-2384 (La. 3/14/03), 839 So.2d 34. In *Mead*, the defendant was arrested after a domestic violence incident in his home. On the way to the police station, the defendant threatened the police officer stating that:

> "I should have shot you this time," and something to the effect of, "if you come back again you better bring your arsenal." Additionally the defendant said, "I'll do everything I can to get your damn badge," and "in about two hours you make the trip back to my house."

*Id.* at 1048. The officer testified he thought the threats were made to influence his actions.

The second circuit affirmed the public intimidation conviction, stating that the defendant made the threats "before he actually arrived at the police station and was booked with the specific intent to influence" the officer's conduct, "i.e., to persuade him not to complete the arrest or certainly not to respond to any other calls from defendant's residence after defendant's release on bond." *Id.* at 1048.

This circuit's *Love* case was partially distinguished by the fifth circuit in *State v. Meyers*, 94-231 (La.App. 5 Cir. 9/14/94), 643 So.2d 1275, wherein the defendant's conviction for public intimidation was affirmed. The defendant's probation officer told him to go to the sheriff's office to be fingerprinted and photographed. At the office, the deputy clerk fingerprinted him and then told him to get his photograph at

the jail. The defendant demanded an explanation, then continued to insist that she take his photograph. A few minutes later in the hallway the defendant threatened the clerk and told her "someone is going to get hurt." She testified that she was afraid of the defendant. Shortly thereafter, the defendant saw the clerk outside and he yelled from a car stating: "You f_ _ _ _ _ _ black b_ _ _ _. I'm going to f_ _ _ you up, me and my boys." *Id.* at 1277. The defendant also made a gesture pointing his hand at the clerk and acting like he was pulling a trigger.

The *Meyers* court stated:

> We find the *Love* case distinguishable on its facts. In the present case, defendant threatened Ms. Anderson in the hallway of the Sheriff's Office as he exited the bathroom and also as he was leaving the area in his friend's car. The record seems clear that at the time these particular threats were made they were made in anger and were intended for retribution for failure to photograph the defendant. There was no evidence to indicate a specific intent to influence the victim's conduct in relation to her position, employment, or duty. In that sense the *Love* case is comparable.

> However, in the instant case the defendant also threatened Ms. Anderson on two occasions in her office in an attempt to convince her to photograph him. The evidence surrounding defendant's conduct in Ms. Anderson's office was sufficient to establish the elements of the offense of public intimidation beyond a reasonable doubt. At trial, Ms. Anderson testified that defendant threatened her and insisted she take his photograph. Ms. Anderson also testified that the two times defendant was in her office, he appeared very angry, causing her to be fearful that he might become violent.

*Id.* at 1278-79.

Finding the opposite result, the second circuit reversed a defendant's public intimidation conviction in *State v. Hall*, 441 So.2d 429 (La.App. 2 Cir. 1983). In *Hall*, the defendant threatened a store clerk with bodily harm and the loss of her job after the defendant had been caught shoplifting and arrested. There was no evidence at trial to show that the victim was being threatened in order to prevent her from testifying in court against the defendant. The court stated that the evidence of the defendant's specific intent was circumstantial and, thus, must exclude every

reasonable hypothesis of innocence.  The second circuit stated:

> Our review of the record compels us to conclude that the state did not meet its burden in this respect.  The only testimony presented on behalf of the state regarding the actual circumstances surrounding the offense came from the victim and the investigating officer.  It was the testimony of the victim that at no time did anyone ever warn her not to appear in court or otherwise attempt to influence her actions in connection with her role as a witness in the city court proceeding.  The stated intent of the threats, as testified to by the victim, was to cause her to lose her job or to cause her physical harm.  The testimony of the investigating officer was that the threats continued even after the defendant had pled guilty to the theft charge in city court.  Other evidence clearly establishes that prior to her arrest on the instant charge, the defendant pled guilty to theft at her first court appearance.  Considering the facts established at trial, while perhaps it might be concluded that the evidence tends to prove that the defendant acted as she did in order to influence Ms. Williams' conduct as a potential witness, it might equally be concluded that the actions of the defendant were intended to accomplish another purpose, e.g. to punish or get even with Ms. Williams' for her actions in connection with defendant's arrest for theft.

*Id.* at 432-33.

As in the instant case, when circumstantial evidence is used to prove the commission of the offense, or more specifically the specific intent, La.R.S. 15:438 provides that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence."  The State bears the burden of proving that the Defendant "actively desired the prescribed criminal consequences to follow his act. . . ." La.R.S. 14:10(1).  In other words, the evidence at trial had to show that the Defendant sought to illegally influence the officers regarding their duties when he threatened them.

In the instant case, we are unable to say that the Defendant, who had been drinking beer that night, had formed the necessary specific intent.  The Defendant was not under arrest at the time he made his statement.  He did not tell the officer to leave his property, and did not specifically threaten him if he did not do so.  His statement that the officer was going to need help is ambiguous at best, and there is at least a

-14-

question as to when the Defendant became aware that the man approaching him was a police officer. Pursuant to this court's holding in *Love*, we find the State failed to prove that Defendant's threat to Officer Broussard was made with the specific intent to influence the officer's actions. Therefore, we reverse the Defendant's count one conviction of public intimidation.

## Count two:

Count two involved the Defendant's threats to Officer Potier and other officers at the station while he was being booked. Again, Defendant contends his statements to Officer Potier were idle threats not intended to influence the officer's conduct as he was already under arrest at that time.[1] The Defendant also argues that Officer Potier was not in a position to grant him lenient treatment or release him.

The State argues this public intimidation conviction was supported by Officer Potier's testimony that he felt the Defendant was trying to intimidate him to drop the charges. In *Love*, this court found it relevant that the officer was not in a position to grant the defendant lenient treatment or release. The State contends, in the instant case, Officer Potier was in a position to grant the Defendant lenient treatment as he could have dropped the charges of public intimidation. However, Officer Potier testified it was uncommon for a suspect to continue to threaten officers at the police station after he knows he is going to jail and is being charged with an offense. This testimony by Officer Potier indicates he was no longer in a position to give the Defendant any special treatment regarding his arrest and pending charges. It also is

---

[1]The Defendant notes that at a pretrial hearing the trial court determined that there was no probable cause for the public intimidation charge of Officer Potier. The court found the State presented no evidence and relieved the Defendant of his bond obligation. (Supp.R.p. 32). At the hearing Officer Potier testified that the Defendant threatened him that he would get him off duty and made references to his wife and family. (Supp. R.p. 30). The threats occurred at the police station when the Defendant was in the booking room. Staff notes that Officer Potier's testimony regarding the threats was similar to his testimony at trial. However, it is clear that neither the trial court, nor this court, is bound by this pre-trial determination.

highly unlikely that Officer Potier would have been in a position to drop charges for a battery committed against another officer.

This court in *Love* found even though the defendant was being transported to the police station when he threatened to kill the arresting officer and his family, these threats were vented anger and were not made in an "or-else" fashion. Similarly, in the instant case, there was no evidence the Defendant's threats to Officer Potier were made in an "or-else" manner. A few minutes earlier, Officer Potier had sprayed the Defendant in the face with "mace," and after he was allowed to wash his eyes, the Defendant vented his anger at the officer. As discussed in the *Meyers* and *Hall* cases, the defendant's intent could reasonably have been to attempt to punish and get back at the officers. In the instant case, the State did not disprove the reasonable hypothesis of innocence that the Defendant made the threats in anger and intended them for retribution for what he considered police misconduct. We find the circumstantial evidence presented at trial was not sufficient to prove the Defendant's specific intent to influence the actions of Officer Potier. Therefore, we reverse the Defendant's count two conviction for public intimidation.

## ASSIGNMENT OF ERROR NO. 2

The Defendant contends the trial court erred in finding there was probable cause for his stop, and his conviction for simple battery must be reversed. He argues Officer Broussard's testimony reveals he had already concluded his traffic violation investigation and driven away when he then decided to conduct a domestic violence investigation. The Defendant contends the officer had no probable cause to believe a crime had been committed.

At the hearing on the motion to suppress, the trial court denied the motion,

stating:

> You should know that presently the state of the law in Louisiana is that if a Police Officer witnesses a traffic violation, regardless of his motive for the stop, the stop is a good one. It doesn't make any difference whether or not he wants to charge him with the traffic violation or not. He can stop him. I find that the Police Officer had probable cause to believe that traffic violations had occurred; i.e., the stop is valid.

The State claims that Officer Broussard had probable cause to arrest the Defendant for the traffic violations he had witnessed pursuant to the authority granted by La.Code Crim.P. art. 213.1. The Louisiana Supreme Court explained:

> As a general matter, police officers may make warrantless arrests if probable cause exists, that is, "when the facts and circumstances known to the arresting officer and of which he has reasonably trustworthy information are sufficient to justify a man of ordinary caution in believing that the person to be arrested has committed a crime." *State v. Marks*, 337 So.2d 1177, 1182 (La.1976) (citing *Beck v. Ohio*, 379 U.S. 89, 90, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964)); La.C.Cr.P. art. 213.

*State v. Cojoe*, 01-2465, p. 4 (La. 10/25/02), 828 So.2d 1101, 1104.

In the instant case, Officer Broussard's testimony was uncontroverted that he observed the Defendant commit multiple traffic violations, and he effected a "rolling stop" before the Defendant pulled into his driveway. However, the officer initially decided to give him a break, but within a few seconds changed his mind and went around the block to return to the residence. Therefore, Officer Broussard had probable cause for the arrest of the Defendant at that time. The Defendant argues the officer had already concluded his traffic investigation when he decided to act on a hunch that a domestic situation might have been occurring. In *Whren v. U.S.*, 517 U.S. 806, 116 S.Ct. 1769 (1996), *cert. denied*, 522 U.S. 1119, 118 S.Ct. 1059 (1998), the United States Supreme Court held that subjective intentions of the police are irrelevant to the probable cause analysis. Thus, even if Officer Broussard intended all along to stop the Defendant to investigate domestic abuse, the fact that he had probable cause to

-17-

stop him for the traffic violations validates the stop. Further, even if probable cause was lacking, the officer did not violate the Defendant's fourth amendment rights by walking up to the porch and asking the Defendant to speak with him. *State v. Dreary*, 99-627 (La. 1/28/00), 753 So.2d 200. Therefore, this assignment of error lacks merit.

## ASSIGNMENT OF ERROR NO. 3

Lastly, the Defendant claims the trial court erred in denying his *Batson* objection to the State's use of a peremptory challenge for a prospective juror. During voir dire, the prospective juror told the court her brother was the victim of a battery. The State questioned her as follows:

PROSPECTIVE JUROR:

Well, my brother got hit by someone with a pipe.

MR. WELTER:

Okay, so someone was attacking him?

PROSPECTIVE JUROR:

Well, he was the one doing it. The guy had waited until he got drunk and . . .

MR. WELTER:

Was the person injured?

PROSPECTIVE JUROR:

Yeah, he got it bad.

MR. WELTER:

Was he knocked out, do you know?

PROSPECTIVE JUROR:

I'm pretty sure he was seeing stars, like you told us.

MR. WELTER:

Do you think it would have been different if he hadn't started it?

-18-

PROSPECTIVE JUROR:

Right.  He should have walked away.

The State peremptorily challenged her as a juror, and the Defendant raised a *Batson* challenge.  The parties argued as follows:

> MR. WELTER:  Her brother got hit by a pipe and was the victim of a crime, although he started it.  I believe at this point she would be biased in the fact that the police officer in this case is alleged to have been struck by a beer bottle by the defendant, and her brother had the same thing happen to him, and I don't believe she could be fair and impartial because her brother, she said, had it coming to him.  And I think she indicated, basically, that he had it coming to him when he got hit by the pipe by the other guy; that he had it coming and it was his fault.

> MR. LEJEUNE: I don't think the juror indicated at any point in time that she couldn't be fair and impartial.  The situation in this case is not at all relevant or has any relationship to her brother being involved in a battery.  I just don't think that that's sufficient cause for a challenge.

The trial court accepted the State's explanation, stating that it met its burden to show a race-neutral reason.  In its brief to this court, the State argues it was not systematically excluding African-Americans from the jury as one-third of the six-person jury was black and the State still had three peremptory challenges left when it accepted the jury.  In addition, the State contends it gave a race-neutral explanation for its challenge.  The State explained that the prospective juror may have felt that the officer in this case should have just walked away to avoid the confrontation with the Defendant.

The jurisprudence is clear that parties in a case may not use peremptory challenges to exclude jurors on the basis of race.  *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712 (1986), *Georgia v. McCollum*, 505 U.S. 42, 112 S.Ct. 2348 (1992), *State v. Knox*, 609 So.2d 803 (La.1992).

This principle of law is found in La.Code Crim.P. art. 795, which states in pertinent part:

C. No peremptory challenge made by the state or the defendant shall be based solely upon the race of the juror. If an objection is made that the state or defense has excluded a juror solely on the basis of race, and a prima facie case supporting that objection is made by the objecting party, the court may demand a satisfactory racially neutral reason for the exercise of the challenge, unless the court is satisfied that such reason is apparent from the voir dire examination of the juror. Such demand and disclosure, if required by the court, shall be made outside of the hearing of any juror or prospective juror.

D. The court shall allow to stand each peremptory challenge exercised for a racially neutral reason either apparent from the examination or disclosed by counsel when required by the court. The provisions of Paragraph C and this Paragraph shall not apply when both the state and the defense have exercised a challenge against the same juror.

E. The court shall allow to stand each peremptory challenge for which a satisfactory racially neutral reason is given. Those jurors who have been peremptorily challenged and for whom no satisfactory racially neutral reason is apparent or given may be ordered returned to the panel, or the court may take such other corrective action as it deems appropriate under the circumstances. The court shall make specific findings regarding each such challenge.

As the voir dire colloquy illustrates, the State's reason for challenging the prospective juror was her potential bias against the police officer victim in this case. As the second circuit court explained:

The explanation need not be persuasive or even plausible; it will be deemed race-neutral unless a discriminatory intent is inherent in the explanation. The ultimate burden of persuasion as to racial motivation rests with, and never shifts from, the opponent of the peremptory exception. *State v. Tyler*, 97-0338 (La.9/9/98), 723 So.2d 939. The trial court's findings with regard to a *Batson* challenge are entitled to great deference on appeal. *Id.*; *Purkett v. Elem*, 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995).

*State v. Wade*, 36,295, p. 8 (La.App. 2 Cir. 10/23/02), 832 So.2d 977, 984, *writ denied*, 02-2875 (La. 4/4/03), 840 So.2d 1213.

Further, the fact that potential jurors are challenged on the basis of a claimed bias, without being questioned about such bias, "raises a strong inference that they were excluded on the basis of race alone." *Williams*, 548 So.2d at 507; cf. *Splunge v. Clark*, 960 F.2d 705, 707-08 (7th Cir.1992) (explanation that venireman didn't understand burden of proof insufficient when prosecutor asks venireman whether the fact that both venireman and defendant are black would affect deliberations, but fails to ask more than one question about the burden of proof). We find

the state's explanation that its sole reason for excluding Brown was based on his residency unpersuasive and was simply a pretext to its true reason, that the state excused Brown because of his race.

*State v. Harris*, 01-0408, pp. 7-8 (La. 6/21/02), 820 So.2d 471, 475-76.

A trial court's ruling on a *Batson* claim is entitled to great deference. Although the State did not question the prospective juror regarding any possible bias she may have had against either party, it did present a race-neutral explanation for its challenge. Under these circumstances, giving due deference to the trial court's ruling, it did not err in allowing the State's peremptory challenge. Therefore, this assignment is without merit.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find the trial court failed to advise the Defendant of the prescriptive period for filing post-conviction relief as required by La.Code Crim.P. art. 930.8. Thus, the trial court should be directed to inform the defendant of the provisions of Article 930.8 by sending appropriate written notice to the defendant within ten days of the rendition of this opinion and to file written proof that the defendant received the notice in the record of the proceedings. *See State v. Fontenot*, 616 So.2d 1353 (La.App. 3 Cir.), *writ denied*, 623 So.2d 1334 (La.1993).

## DECREE

For the foregoing reasons, the Defendant's convictions on both counts of public intimidation are reversed, and those sentences vacated. The conviction and sentence for simple battery is affirmed. The trial court is instructed to advise the Defendant of the time period for filing post-conviction relief as required by La.Code Crim.P. art. 930.8.

**CONVICTION AND SENTENCE FOR SIMPLE BATTERY**

**AFFIRMED; CONVICTION AND SENTENCE ON COUNT ONE AND TWO OF PUBLIC INTIMIDATION ARE REVERSED AND THE SENTENCES VACATED.**

-22-